Madden, Judge,
delivered the opinion of the court:
These are suits by operating employees of The Alaska Nail-road for overtime pay under section 23 of the Act of March 28, 1934, 5 U. S. C. 673c. Operating employees are conductors, engineers, brakemen and firemen who are in charge of trains which move from station to station, and yard employees such as switchmen and hostlers. By the practice of The Alaska Railroad, and perhaps all American railroads, such *550 employees are paid on a dual system, including both time spent at work and miles traveled. Their wages are computed at the proper rate per hour for the hours spent at work during a day, and again at the proper rate per mile for the miles traveled during that day. Whichever computation gives the most pay is retained, and the other one is discarded.
In earlier litigation about the application of section 23 to employees of The Alaska Eailroad, the Government has contended that, since it would be difficult, perhaps impossible, to apply a forty-hour week law with time and a half for overtime to the operating employees paid on the dual system, the court should find that Congress did not intend section 23 to apply to any employees of the railroad. We concluded that the statute was, by its terms, applicable to the railroad and could be applied without inconvenience to nonoperating employees, as to whom there was no dual system of pay. Poggas v. United States, 118 C. Cls. 385; Parmenter v. United States, 125 C. Cls. 35; Nelson v. United States, 126 C. Cls. 553; Samples, et al. [In case of Hugh G. Savage] v. United States, 131 C. Cls. 797.
In our consideration of each of the former cases, we have been admonished by the Government that if we persisted in proceeding along the path we had taken we would finally reach the point where such ingenuity as we had could take us no farther. On the other hand, we were consoled by plaintiffs’ counsel’s assurance that these dire forebodings were being uttered in terrorem. So we proceeded, and have now to deal with the operating employees. As we rather expected, we find that it is neither easy nor impossible to apply section 23 to them.
Under the dual system of pay, 12% miles per hour is regarded as the standard speed of a train, and 100 miles of travel produces the same pay as eight hours of work paid by the hour. If it takes the train more than eight hours to travel the 100 miles, pay by the hour will be greater, and that computation will be used. . If, as is not unusual, the train completes the journey in less than eight hours, pay by the mile will be greater and that computation will be used.
A forty-hour week, of course, with overtime after forty hours, must be applied upon the basis of hours worked, and *551 not miles traveled or pay received. Hence if a trainman makes a 100 mile trip in six hours, he receives as much pay for the trip as a man would receive if he had made the trip on a slower train in eight hours, but he has accumulated only six hours toward a forty-hour week.
Under the railroad’s pay system, there were also numerous pay items called “arbitraries” for which the employee received pay though he did not work, or received pay for something extra which he did during the time that he was already working and being paid. The arbitraries are described in findings 42 and 43.
Prior to 1948, the railroad had preserved its payroll records, engineers’ and conductors’ time slips, and dispatchers’ train sheets. But in 1948 a new auditor effected a house cleaning of old records, and many records which would have been helpful in this litigation were destroyed. Suits for overtime were pending in this court when the records were destroyed, but the official who caused the destruction was not aware of that fact. Other officials were on notice of the claims, at least during the latter period of the destruction of the records, and it is most unfortunate that the records are not available, since their unavailability greatly increases the difficulties of the parties in presenting their cases, and of the court in arriving at decisions which it can regard as reasonably reliable. In the circumstances, the absence of the missing records must not be allowed to prejudice the position of the plaintiffs any more than is absolutely necessary.
The problem created by the destruction of records is that, for the years prior to 1941, as to most of the employees we have nothing except the summary pay sheets of the railroad showing the hours or miles paid for and the rate and total amount of pay. In many cases the sheets do not show hours, but miles, the hours having for some reason been translated into miles on the pay sheets. Further, for pay purposes, the arbitraries such as the layover day of eight hours each week, and all the other arbitraries are included on the pay sheets in terms of hours, or miles, i. e., the number of hours or miles which would account for the amount of pay which the particular arbitrary called for.
*552 The plaintiffs do not claim any right to count the hours which appear on the pay sheets but which do not represent hours worked, in ascertaining whether the time worked exceeded forty hours, and if so, by how much. Nor do they claim that the pay received for arbitrarles should be counted in ascertaining the basic hourly wage which is to be multiplied by one and one-half in computing overtime. They do, however, and rightly, deny the Government’s claim that these items of pay without work should be set off against overtime pay. The arbitrarles are items conceded to the employees by their superiors for reasons which seemed sufficient to them, and have no relation to the policy of the forty-hour week, with overtime, set by section 23 of the Act of March 28,1934.
One exception to the statement just made about offsets should be noted. The wage rate fixed by the railroad on May 1, 1943, and thereafter, gave the employees on trains other than passenger trains time and one-half for time in excess of eight hours spent on runs of 100 miles or less, and, on runs in excess of 100 miles, the excess over the quotient obtained by dividing that number of miles divided by 12*4. This was overtime pay, called dual system overtime, and the plaintiffs concede that the railroad should be credited with it in the week during which it was earned. If the credit was not used in that week, it could not be set off against overtime earned in another week.
The determination of overtime under section 23 is wholly applicable to a time basis for work in excess of forty hours a week. It need not nor should not destroy the elective “dual system” of pay whereby the greater compensation in hours or miles is payable, and which was in effect many years before 1934. In those instances where the earnings of the employee were greater in miles, by reason of operating trains at speeds in excess of the standard rate of 12y2 miles per hour, than the amounts earned on a time basis plus overtime, as described above, the mileage basis will continue in effect as heretofore but the comparison should be made weekly. In such weeks, the amount earned will be the greater of the amount earned and paid on a mileage basis or the amount earned including section 23 overtime less overtime previously paid to operating employees after May 1, 1943.
*553 Another problem which we resolved in Poggas, supra, is again raised by Government counsel in this case. It is the problem of the basic hourly wage upon which overtime is to be computed. Section 23 said that, for the forty-hour week, wages should be set so that the weekly wage should not be less than it was on June 1,1932. Since the workweek of the operating employees in 1932 and 1934 was a forty-eight hour week, the statute required that the hourly rate be increased by 20 percent when the hours were reduced to forty. This was, of course, not done, since section 23 was regarded as inapplicable to The Alaska Eailroad. On occasions thereafter, wages on the railroad were raised, as was done on American railroads and in industry and in the Government. The Government urges that if the statutory increase had been made in 1934, these wage board increases would not have been made. One can only speculate about such things, and we think such speculation should not be at the expense of the plaintiffs whose rights under the 1934 act have been denied them for more than twenty years. If the employees had received the 1934 increase, as they should have, the later percentage increases would have applied to the increased figure; hence the solution is to apply the 20 percent increase to the current hourly wage. However, the plaintiffs cannot recover the amount which they were underpaid for the first forty hours in each week. The petitions ask recovery only for overtime and the Act of November 1, 1949, Public. Law 440, 81st Cong., 1st sess., 63 Stat. 1062, waiving the statute of limitations for these employees, refers only to overtime. The proper straight-time rate is ascertained then only for the purpose of computing overtime. The plaintiffs concede that the increase granted them after the enactment of the Federal Employees Pay Act of 1945, 5 U. S. C. 901, eliminated the necessity of recomputing the straight-time rate after that time.
We come at last to the question of how to apply the principles which we have stated to the pay sheets, the only available records up to 1947, except in some instances in which the employee had preserved his stubbooks or diary, showing the details of what he did.
*554 In Finding 54, we have provided a schedule according to which computations can be made for the employees whose detailed records are available, or for the periods for which such records are available. Our schedule differs from those proposed by the plaintiffs in that it omits any reimbursement for deficiencies in straight-time pay, to which employees might have been entitled under section 23. We have stated hereinbefore the reason for that omission. In using this schedule for periods after July 1, 1945, the recomputation of the straight-time hourly rate for the purpose of ascertaining the proper overtime rate need hot be made. At that time the straight-time rate was made commensurate with the requirements of section 23.
In Finding 55, we have provided a schedule according to which computations can be made for employees, or for periods, for which detailed information is not available. In cases where the hours or miles converted to hours equal or exceed the guaranteed minimum mileage in effect for a given period, the number 48 is arbitrarily taken for the hours worked, since that represents the equivalent in hours of the guaranteed mileage traveled at standard speed, after the elimination of the miles arbitrarily attributed to the one layover day per week. The use of the figure 48 is justified also because that was the regular administrative workweek. This computation is, in effect, based on the assumption that all hours paid for in excess of forty-eight represent, not hours of work but pay for layover time and other arbitraries, without consideration of elective pay receivable under the dual system. In using this schedule for periods after July 1, 1945, the adjustment of straight-time pay should not be made.
Where an employee has worked at different jobs carrying different rates of pay during the same week, the rate at which the largest number of hours was worked should be used in computing overtime.
By the use of our findings and opinion, it should be possible to compute, in many cases exactly and in the others with fair approximation, the amount of overtime to which the plaintiffs are entitled.
*555 The plaintiffs are entitled to recover and judgment will be entered to that effect. Further proceedings to determine the amounts oí the judgment will be had under Eule 38 (c).
It is so ordered.
LaRamoee, Judge; Whitaker, Judge; LittletoN, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Eichard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. Following the decision in the case of Poggas v. United States, 118 C. Cls. 385, the parties agreed to present to the court for determination the claims of certain operating employees of The Alaska Eailroad as distinguished from non-operating employees of the type exemplified by Mr. Poggas. The claims of these six plaintiffs (Cecil Brayford, Woodrow W. Farr, L. J. Scanlon, and Ben J. Silbernagel, plaintiffs in No. 48637; Frank O’Donnell, one of the plaintiffs in No. 48891; and Charles E. Cameron, one of the plaintiffs in No. 49891) were accordingly selected as test cases. When the term “plaintiffs” is used herein, it shall be deemed to refer collectively to all six of these individuals.
2. The plaintiffs are all employees or past employees of The Alaska Eailroad, an agency of the United States. All of them were, at least during the major part of their service, operating employees in train and engine service as distinguished from nonoperating employees of the type exemplified by Mr. Poggas.
3. This action was instituted to recover overtime compensation under section 23 of the act of March 28,1934 (48 Stat. 522, 5 U. S. C. 673c), which reads as follows:
The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, which is set by wage boards or other wage-fixing authorities, shall be re-established and maintained at rates not lower than necessary to restore the full weekly earnings' of such employees in accordance with the full-time weekly earnings under the respective wage schedules in effect *556 on June 1, 1932: Provided, That the regular hours of labor shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one half.
4. Pursuant to the provisions of the act of March 12, 1914 (38 Stat. 305, 48 U. S. C. 301), authorizing him to construct a railroad in Alaska, to employ such officers, agents, or agencies, in his discretion, as might be necessary to enable him to carry out the purposes of the act, and to fix the compensation of all officers, agents, or employees appointed or designated by him, the President of the United States on June 8, 1923, promulgated Executive Order 3861 which authorized the Secretary of the Interior to operate the railroad “in all respects and to all intents and purposes, the same as if the operation thereof had been placed by law under the jurisdiction of the Secretary of the Interior”.
5. On January 11, 1929, the Secretary of the Interior prescribed regulations governing the office of the general manager of The Alaska Eailroad. They provided, among other things, that:
The following matters must be presented to and receive the approval of the Secretary before becoming effective:
(7) Increases or decreases in rates of pay, or changes in working conditions, of any class or body of employees (except minor changes).
By Order No. 2327, May 29, 1947, of the Department of the Interior, the authority of the general manager of The Alaska Eailroad to act for and in place of the Secretary of the Interior, was limited, among other ways, as follows:
The following matters must be presented to and receive the approval of the Secretary before becoming effective:
* $ ‡ * *
(5) Proposed policies and procedures for dealing with employees and their representatives in the determinations of rates of pay and methods of compensation, regulation of working hours, working rules and adjustment of grievances, as well as proposed increases or decreases in rates of pay or changes in methods of compensation, *557 regulation of working hours, or in the basic working rules of any employee by class, craft, department or appropriate subdivisions thereof. 43 CFR, 1947 Supp., 4.530 (Book 5, p. 6016).
6. During all periods of time relevant to these proceedings the rates of pay of employees of The Alaska Kailroad, including plaintiffs, have been fixed by wage boards or other wage-fixing authorities and in accordance with the following procedure:
The general manager of the railroad, after conferences with the union representatives of the employees (sometimes referred to as collective bargaining negotiations) which may or may not result in an agreement, submits proposed increases or adjustments in wage schedules for the approval of the Secretary of the Interior or, during a part of the period covered by these proceedings, to his delegate, the Special Advisor on Labor Kelations. There is no evidence that the Secretary of the Interior, during the period involvéd in these cases, ever disapproved a proposed wage schedule agreed to by the general manager and the employees’ representatives. In one instance, namely in 1947, as more fully appears in finding 27, when the general manager and the employees’ representatives were unable to reach an agreement, the entire matter was referred to the Secretary of the Interior for decision who, after a hearing, determined that the proposal as made by the general manager for the adjustment of the controversy should be changed in certain respects more favorable to the employees and he issued an order putting new wage schedules into effect in conformity with his determination of the entire matter, but without having secured the approval of the employees’ representatives.
In arriving at approved wage rates in these conferences and negotiations, consideration is given to rates paid employees performing similar duties on railroads in the continental United States. In addition, in view of higher living costs in Alaska, an effort is made to maintain Alaska Railroad wages at a level at least 25 percent higher than wages for comparable positions in the continental United States. This percentage is not rigidly applied as a maximum and in instances might be greater. Basic compensation *558 in recent years bas been modeled generally upon that prevailing on the Northern Pacific Railway with the Alaska differential being added thereto to cover the higher cost of living in that territory. The cost of living differential for both operating and nonoperating employees of The Alaska Railroad has been based, since May 1,1948, on a differential between Seattle and Alaska railbelt consumer prices of 44 to 45 percent. The actual differential in pay rates between The Alaska Railroad and the Northern Pacific Railway has been more than 44 percent for lower wage employees and less than 44 percent for higher wage employees. Where inequities result in particular instances from the general application of a wage scheme, The Alaska Railroad endeavors to iron them out by appropriate adjustments with the concurrence of the employees’ union representatives.
7. The working rules, as distinguished from wage schedules, of operating employees of The Alaska Railroad are contained in labor agreements which were signed by representatives of labor and management after conferences and collective bargaining negotiations similar to those which occurred in connection with wage schedule agreements. As will hereinafter appear, these working rules often materially affected the total compensation paid to operating employees. While the regulations referred to in finding 5 provided for the approval of such matters by the Secretary of the Interior before becoming effective, the working rules agreements negotiated prior to the agreement effective May 16, 1949, were not submitted to the Secretary for approval. However, throughout the entire period the parties operated in accordance with these agreements without regard to whether they had been approved by the Secretary and there is no evidence in the record of any question having been raised of lack of approval.
8. A general description of the principal classifications of work performed by the plaintiffs during the periods of employment involved herein is as follows:
Cecil Brayford. Mr. Brayford began working for The Alaska Railroad in 1929 and has continued in its employment since that time. On March 28, 1934, he was working as a first-class helper in the mechanical department, that is, *559 a nonoperating position. During 1934 he performed some work as a fireman in the operating department but most of his work until after 1939 was in the nonoperating department. About December 1940 he was promoted to the classification of locomotive engineer and thereafter maintained a seniority status as both fireman and engineer. From August 1, 1941, to January 1, 1945, he worked exclusively in the operating department as engineer and fireman. During 1945 he divided his time between duty as an engineer in the operating department and a hostler in the mechanical department. He served as an engineer in the operating department from January 1, 1946, to sometime in June of that year, when he became road foreman of engines, a position in the mechanical department, which position he held until the end of that year when he returned to the operating department as an engineer. Thereafter and continuing at least until hearings were held in these proceedings in July 1952, he was engaged almost entirely in the road service of the operating department as an engineer.
Woodrow W. Farr. Mr. Farr began work for The Alaska Eailroad December 6, 1941, as a brakeman in the operating department and has continued in that department since that time. In August 1944 he was' promoted to the classification of conductor, thereby attaining a double seniority status under the working rules, that is, as brakeman and conductor, which status he still retains.
L. J. Scanlon. Mr. Scanlon has been working for The Alaska Eailroad since 1917. On March 28, 1934, he was employed as a brakeman in the operating department, at which time he had double seniority as a brakeman and conductor. Since March 28,1934, he has worked exclusively in the operating department as brakeman, baggageman, and conductor.
Ben J. Silbernagel. Mr. Silb'ernagel was first employed by The Alaska Eailroad during the summers of 1937 and 1938 as a pitman in the maintenance-of-way department and part of the summer of 1939 as a laborer in the same department. He continued to work in that department until about July or August 1940 when he commenced work in the operating department as a brakeman, and thereafter worked in that *560 department as a brakeman and conductor having acquired the classification of conductor in September 1943.
Frank O’Donnell. Mr. O’Donnell was employed by The Alaska Railroad from 1923 until his retirement on March 31, 1951. On March 28,1934, he was a hostler in the mechanical department. Subsequent to that date and continuing until his retirement, he worked principally as a fireman and engineer in the operating department interspersed up to June 1945 by various periods of service in the mechanical department.
Charles E. Cameron. Mr. Cameron started work in the operating department of The Alaska Railroad about April 12, 1941, as a fireman. Prior to that time and since July 1934, he had been engaged for short periods each year on various jobs in nonoperating departments. Pie was on military leave from December 1,1943, until January 1,1946. In June 1946, he became a qualified locomotive engineer and thereafter maintained a seniority status' as fireman and engineer in the operating department. He has continued to work in that department since that time.
9. By General Circular No. 310 of The Alaska Railroad, dated July 15, 1932, the Economy Act of June 30, 1932, 47 Stat. 400, providing for compulsory time off without pay for certain employees of the Federal Government, was applied as of July 1,1932, to all employees of The Alaska Railroad (including the plaintiffs).
10. By General Circular No. 323, of The Alaska Railroad, dated April 1,1933, the Economy Act of March 20, 1933, 48 Stat. 8, providing for a percentage reduction of pay for certain employees of the Federal Government, was applied to all employees of The Alaska Railroad (including the plaintiffs) as of April 1,1933.
11. June 8,1934, the general manager of The Alaska Railroad issued to “all concerned” the following General Circular No. 344:
The Independent Offices Appropriation Act, 1935 (Public No. 141,73d Congress, March 28,1934) provides in part as follows:
“Sec. 23. The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, *561 which is set by wage boards or other wage-fixing authorities, shall be reestablished and maintained at rates not lower than necessary to restore the full weekly earnings of such employees in accordance with the full-time weekly earnings under the respective wage schedules in effect on June 1,1932: Pkovided, That the regular hours of labor shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one-half.”
As Section 23, quoted above, applies to The Alaska Railroad, effective during the week ending June 16, 1934, and thereafter until Section 23 is amended or repealed, the weekly hours of service of employees to whom it is applicable will be 40 hours per week and the weekly compensation shall be the same as paid on June 1, 1932.
While the regular hours of work of per annum and per month employees within the terms of Section 23 of the Independent Offices Appropriation Act, 1935, are required to be fixed at not to exceed 40 per week, whereas the regular hours previously may have been 44 or 48 per week, the rate of compensation should remain on the same annual or monthly basis, the only adjustment, if any, required being that necessary to pay an annual rate not lower than that received June 1, 1932, for the same duties, less the percentage reduction.
No overtime shall be worked except in case of extraordinary emergency. If, in case of an éxtraordinary emergency, employees are required to work more than the regular hours on any one calendar day, but are not required to work in excess of 40 hours during the week, payment of overtime compensation is not authorized. The term “overtime” is not applicable to employees paid on an annual or monthly basis and there is no purpose or intent shown by Section 23 to extend the right to overtime compensation to employees paid on an annual or monthly basis who may be required to work more than their regular tour of duty of 40 hours per week.
On July 13, 1934, the Comptroller General of the United States rendered an opinion, 14 Comp. Gen. 42, upon a submission by the Secretary of the Interior, holding that section 23 of the act of March 28,1934, was inapplicable to employees of The Alaska Railroad because, as he said, “Railroad employees are regarded generally as a distinct class of personnel and their occupations as not being within ‘trades and *562 occupations’ of mechanics and laborers as employed in section 23 of the act of March 28,1934.”
Application of General Circular No. 344 continued until July 15, 1934, when the general manager issued General Circular No. 347, also to “all concerned,” reading as follows:
The Comptroller General of the United States advises that The Alaska Eailroad employees are not subject to Section 23 of the Independent Offices’ Appropriation Act, 1935 (Public No. 141, 73d Congress, March 25, 1934), which regulated the weekly compensation, hours of work, and overtime compensation for the several trades and occupations in various Government Departments.
Effective July 15, 1934, the provisions of General Circular No. 344 are terminated and hours of service and/or salary rates will be re-established in all departments of the Eailroad in accordance with regulations in effect prior to June 10,1934, the effective date of General Circular No. 344.
Except for the period June 10 to July 15, 1934, and as outlined above in this finding, section 23 of the act of March 28,1934, was never made applicable by The Alaska Eailroad in determining the pay of its employees.
12. In General Circular No. 356 of The Alaska Eailroad, dated February 4, 1935, the percentage of reduction applicable to its employees under section 2 (b) of the Economy Act of March 20, 1933, was announced to be five percent.
13. General Circular No. 357 of The Alaska Eailroad, dated March 25, 1935, announced that in accordance with section 2 of Public Be,solution No. 3,74th Congress, approved February 13, 1935, 49 Stat. 22, there would be no reduction of salaries on The Alaska Eailroad after March 31, 1935.
14. Wage Schedule No. 12, signed April 25,1929, and effective May 1,1929, remained in force from its effective date until it was superseded by Wage Schedule No. 13 which became effective May 1,1936, such wage schedule thus being in force on June 1, 1932, and March 28, 1934.
Wage Schedule No. 12 contained the following provisions with respect to overtime:
All overtime rates quoted in this schedule are for time worked on Sundays, holidays, and any time in excess *563 of eight hours on regular work days. See separate sheet for overtime Mechanical Department.
* * * * #
Overtime will be paid Deck Hands and Deck Boys at home terminals, at the rate of fifty cents per hour, when working cargo on Sundays or holidays, for each hour worked, and other days for each hour worked between 6:00 P. M. to 6: 00 A. M._ The term “working cargo” means loading or unloading freight, and does not include handling mail, baggage or express.
* * '-H *
Overtime rates are hereby authorized for monthly employees of the Mechanical Department, at rates listed below, engaged in emergency repair work, necessitated by Floods, Snow Slides, Wrecks, Marine Work, Marine Ways at Nenana, Operation of Gas Cars, Electrical and Water Works, for time worked on Sundays, Holidays, and any time in excess of eight hours on regular work days.
In general (except for clerical and administrative employees, nonoperating employees in Anchorage and river boat employees), the regular hours of labor in effect during the period of Wage Schedule No. 12 and continuing thereafter until the issuance of Department Order No. 1775 on December 26,1942, were eight hours a day, six days a week, thus constituting an administrative workweek of forty-eight hours. By Department Order No. 1775, an administrative workweek of forty-eight hours was established for the Department of the Interior, including The Alaska Railroad, and that continued for most of the employees of The Alaska Railroad, including plaintiffs, until September 1,1949, when nonoperating employees with a few exceptions were placed on an administrative workweek of forty hours, consisting of five days of eight hours each. Plowever, operating employees in road service, including plaintiffs, continued on an administrative workweek of forty-eight hours.
Most of the nonoperating employees were paid on the basis of a calendar month. Overtime allowed and paid to such employees was for the actual time worked in excess of an eight-hour day and it was computed in the following maimer: From 365 calendar days a year there was deducted *564 52 Sundays and 7 holidays, thus leaving 306 regular work days a year. At eight hours a day, that amounted to 2,448 working hours a year and 204 working hours a month. The monthly pay was then divided by 204 in order to arrive at the hourly rate for actual overtime worked. This method of computing hourly rates for the payment of overtime on monthly salaries continued until May 1, 1943, when it was revised in accordance with the act of May 7, 1943.
The compensation of operating employees was also computed and paid upon a calendar month. It was based on 100 miles a calendar day. As will hereinafter appear, such regularly assigned employees, as distinguished from “extra board” workers who may be called for various types of work from time to time, received a monthly guaranteed pay based on a thirty-day month and 3,000 miles when converted to miles for pay purposes. The daily rate was computed at l/30th of the monthly guaranteed rate, that is, 100 miles. The hourly rate was computed by taking l/240th of the monthly guaranteed pay. The mileage rate was convertible at l/3000th of the monthly rate, l/100th of the daily rate, and 1/12% of the hourly rate. The mileage rates were not applicable to operating employees regularly assigned in the yard service nor to hostlers, their helpers, engine watchmen or engine hostlers stationed at certain designated points. The following rates were in effect June 1, 1932, and March 28,1934, for all operating services:

15. Wage Schedule No. 13 became effective May 1, 1936, and superseded Wage Schedule No. 12. However, the wage and mileage rates for all operating services remained the same as in Wage Schedule No. 12. By General Circular No. *565 397 dated June 20, 1938, the employees of The Alaska Bail-road were advised of a general increase of 10 percent in their rates of pay effective July 1,1938, such announcement reading as follows:
Effective July 1, 1938, the rates of pay applying to positions with headquarters in AJaska, excepting the position of General Manager, as contained in Wage Schedule No. 13 and supplements thereto, are increased by ten (10) percent: Pkovided, that this provision establishes a rate of 64 cents per hour for laborers; Ant> Provided Further, that the increased rate is to continue only until the amount of $160,000 has been expended for this purpose.
Wage Schedule No. 14, which became effective July 1, 1939, and schedule of pay, rules and regulations governing road service employees effective July 15, 1939, provided for rates of pay approximately the same as provided for in the 10 percent increase referred to above. Wage rates for the operating groups under these schedules were as follows:

16. By General Circular No. 470 of The Alaska Kailroad dated December 31, 1941, the wages of substantially all of its employees, including both operating and nonoperating groups, were increased as of January 1, 1942. Operating employees, including the plantiffs, received a flat increase of $28.50 as a monthly minimum with corresponding increases in daily, hourly and mileage rates, whereas nonoperating-employees with certain minor exceptions received an increase of $25 per month, with proportionate increase in overtime rates. The foregoing increases were incorporated in Wage Schedule No. 15, effective January 1, 1942. The adjusted rates applicable to all services in the operating groups were as follows:

*566

17. The increases in rates referred to in the preceding findings were made to correspond to an increase which, the employees of the railroads in continental United States had received plus the cost of living differential. However, the increases granted to these latter employees were effective September 1, 1941, whereas the Comptroller General had held that, in the absence of specific statutory authority, an administrative retroactive increase in the wages of government employees could not be made. In order to give to the employees of The Alaska Eailroad an increase for the period September 1 to December 31,1941, similar to that granted to employees on railroads in the continental United States, a bill was introduced in the 77th Congress which was enacted as Public Law No. 825, approved December 22, 1942. That statute provided for various increases for substantially all of the employees of The Alaska Eailroad, 'both operating and nonoperating, including 7y2 percent for all operating groups, $22.50 per month for monthly employees, and overtime pay for monthly employees of 11.03 cents per hour. The bill further provided that the increases should be “computed in accordance with the regular practice of The Alaska Eailroad.”
18. By circular letter dated April 15, 1943, and effective April 20,1943, compensation for operating employees in yard service was adjusted to the following rates:

*567 No change was made at that time in the compensation of other operating employees. Prior to that time the corresponding rates of pay for the same classes of operating employees in road service, snow service and work trains had been the same as for yard service employees but the yard service employees had not had the benefit of the alternate basis of computing their compensation on miles run, as more fully hereinafter described with respect to the dual system of compensation for operating employees. The principal advantage of yard service was the regular hours in the same area.
19. On September 30, 1943, The Alaska Kailroad issued General Circular No. 513 with respect to War Overtime Pay Act of 1943, which circular read as follows:
1. The Comptroller General in decision of August 21, 1943 (B-36217) held that the War Overtime Pay Act of 1943, approved May 7, 1943, Public Law 49, 78th Congress, is not applicable to employees of The Alaska Kailroad whose wages are fixed and adjusted on a per diem, per hour, or piece work basis in accordance with administrative procedure, but that those of the Kailroad employees whose wages are fixed and adjusted' on a monthly or yearly basis come within the purview of the Act effective on and after May 1,1943.
2. Pursuant to authority contained in the War Overtime Pay Act, the rules and regulations promulgated by Civil Service Commission by Department Circular No. 424, dated May 8,1943, or amendments thereto, will govern the administration of the Act in its application to the per annum and monthly, employees of the Kailroad.
3. The Secretary of the Interior in Department Order No. 1775 of December 26, 1942, established throughout the Department a forty-eight hour administrative work week, and authority to establish the hours of duty in the field within the provisions of this order was delegated to the General Manager. The hours of duty as now established for employees of the Alaska Kailroad will continue.
4. Pursuant to Department of the Interior Order No. 1821, dated May 26,1943, and Part III, Section 1 of Civil Service Commission Departmental Circular No. 424, the General Manager is authorized to order or approve overtime in excess of the administrative work week and to elect to grant compensatory time off from duty without *568 loss of pay in lieu of overtime compensation to full-time per annum employees. Department beads will request the General Manager’s written approval for excess overtime work only in case of emergency and will also make a written report in duplicate to the General Manager at the close of each month showing record of such overtime in excess of the established work week of 48 hours with the reasons therefor. All employees are cautioned that excess overtime must be approved'.
Overtime pay under the War Overtime Pay Act of 1943 was computed on a calendar basis and was limited to the employee’s basic compensation not in excess of $2,900 per annum in the same manner it ivas applied to employees hi the classified service. Nonoperating employees whose monthly or annual pay equaled or exceeded $2,900 a year received the maximum overtime pay of $52.36 per month for a 48-hour week, that is, 21.6667 percent of their monthly pay up to the maximum of $241.667 per month.
20. Pursuant to the circular set out in the preceding finding, The Alaska Eailroad did not consider the War Overtime Pay Act of 1943 applicable to the operating employees and certain other employees of The Alaska Eailroad. As a result negotiations were carried out between the management of The Alaska Eailroad and representatives of the employees for the purpose of adjusting the compensation of the employees not otherwise provided for by the War Overtime Pay Act of 1943. These negotiations culminated in an agreement effective October 1,1943, on which date The Alaska Eailroad issued General Circular No. 516 putting these rates into effect. The rates agreed upon were included in Wage Schedule No. 16 effective December 1,1943. The provisions in that schedule with respect to train and engine service employees read as follows:
TraiN and Engine Service Employees Except Yard Service

*569 Oil runs of one hundred (100) miles or less, overtime will begin at the expiration of eight (8) hours; on runs of over one hundred (100) miles, overtime will begin when the time on duty exceeds the miles run divided by twelve and one-half (12%), all time to be computed daily. Overtime shall be paid for on the minute basis at an hourly rate of one-eighth (%) of the daily rate for passenger service and at an hourly rate of three-sixteenths (%6). of the daily rate for all other classes of service.
ThaiN and Engine Service Employees — Yard Service

Overtime shall be paid for all time worked in excess of eight (8) hours per day on the minute basis, at one and one-half time the hourly rate.
Hostlers and Engine Watchmen

Overtime shall be paid for all time worked in excess of eight (8) hours per day on the minute basis, at one and one-half time the hourly rate.
This is the first instance, during the period here involved, where any agreement with the operating groups provided for premium overtime pay on The Alaska Eailroad. No premium rate of pay was provided for passenger service since such trains usually exceeded the pay speed of 12% miles per hour.
That schedule contained this further provision with respect to payment for overtime for hourly employees:
Hourly employees, except the classes shown below, will be paid overtime for work in excess of the estab *570 lished work week of forty-eight (48) hours at a rate of one and one-half (1%) times the hourly rate:
Overtime rates for Locomotive Engineers, Locomotive Firemen, Conductors, Baggagemen, Brakemen, Hostlers, Engine Watchmen, are stated in connection with their rates.
Longshoremen and Eska Mine Employees.
21. Since the War Overtime Pay Act of 1943, effective May 1, 1943, did not provide for increases in compensation for all employees of The Alaska Railroad and since the agreement referred to in the preceding finding, effective October 1, 1943, which provided for increases in compensation for the employees of The Alaska Railroad not covered by the War Overtime Pay Act of 1943, could not, under the rulings of the Comptroller General, in the absence of specific statutory authority be administratively made retroactive, a bill was introduced in the 78th Congress to authorize increases in wages for these latter employees for the period from May 1 to September 30,1943, inclusive. That bill was enacted as Public Law No. 548 approved December 23,1944. The rates of pay per hour for train and engine service employees provided in that act were the same as those set out in Wage Schedule No. 16 and referred to in the preceding finding.
By May 1, 1943, increases in rates of compensation given to employees of The Alaska Railroad (without considering whatever increases they may be entitled to under section 23 of the act of March 28, 1934) amounted to more than 30 percent of the minimum rates in effect June 1, 1932, and March 28,1934.
22. General Circular No. 513, referred to in finding 19, was canceled effective July 1,1945, the provisions of the War Overtime Pay Act of 1943 having expired June 30, 1945. However, the War Overtime Pay Act rates were continued in effect by General Circular No. 559, ctated July 2, 1945, until the establishment of new rates.
On November 20, 1945, the Comptroller General rendered an opinion, 25 Comp. Gen. 409, upon a submission by the Secretary of the Interior, holding that section 203 of the Federal Employees Pay Act of 1945 (act of June 30, 1945, 59 Stat. 296, 297, 5 U. S. C. 901, 913) was applicable to em *571 ployees of The Alaska Railroad whose compensation was fixed on a monthly or yearly basis, but that the act had no application to employees of The Alaska Railroad whose compensation was fixed on a per diem, per hour, or piecework basis. Material portions of that statute read as follows:
Sec. 102. (c) This Act, except sections 203 and 607, shall not apply to employees whose basic compensation is fixed and adjusted from time to time in accordance with prevailing.rates by wage boards or similar administrative authority serving the same purpose. * * *
Sec. 203. Employees whose basic rate of compensation is fixed on an annual or monthly basis and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose shall be entitled to overtime pay in accordance with the provisions of section 23 of the Act of March 28,1934 (U. S. C., 1940 edition, title 5, sec. 673c). The rate of compensation for each hour of overtime employment of any such employee shall be computed as follows:
(a) If the basic rate of compensation of the employee is fixed on an annual basis, divide such basic rate of compensation by two thousand and eighty and multiply the quotient by one and one-half; and
(b) If the basic rate of compensation of the employee is fixed on a monthly basis, multiply such basic rate of compensation by twelve to derive a basic annual rate of compensation, divide such basic annual rate of compensation by two thousand and eighty, and multiply the quotient by one and one-half.
23. By General Circular No. 574 of The Alaska Railroad dated December 10, 1945, in accordance with the foregoing decision of the Comptroller General, section 203 of the Federal Employees Pay Act of 1945 was applied to certain railroad employees, not including the plaintiffs, effective on and after July 1, 1945. With certain exceptions not here material, that circular provided that “an administrative workweek of 48 hours consisting of six 8-hour days, commencing on Monday and ending not later than Saturday is prescribed, the first 40 hours of which will be the basic workweek.” Consistent with that circular, the general manager of The Alaska Railroad on the same day issued the following as Supplement No. 52 to Wage Schedule No. 16:

*572
To All Concerned:

The Comptroller General in decision of November 20, 1945 (B-53243) held that employees of The Alaska Railroad whose salaries are fixed and adjusted on a monthly or yearly basis come within the overtime provisions of Section 203 of the Federal Employees Pay Act of 1945, effective July 1, 1945, but that the said act has no application to employees of The Alaska Railroad whose services are fixed or adjusted on a per diem, per hour, or piecework basis. Accordingly the overtime provision for monthly and per annum employees contained on page 14 of Wage Schedule No. 16 is amended as follows:
OVERTIME

Monthly and Per Annum Employees:

1. The rate of compensation for each hour of overtime employment for employees paid on a monthly or yearly basis shall be computed as follows:
(a) If the basic rate of compensation of the employee is fixed on an annual basis, divide such basic rate of compensation by two thousand eighty (2,080) and multiply the quotient by one and one-half; and
(b) If the basic rate of compensation of the employee is fixed' on a monthly basis, multiply such basic rate of compensation by twelve to derive a basic annual rate of compensation, divide such basic annual rate of compensation by two thousand eighty (2,080), and multiply the quotient by one and one-half.
2. Whenever, for the purpose of computing overtime pay under these regulations, it is necessary to convert a basic monthly or annual rate to a basic weekly, daily or hourly rate the following rules shall govern:
(a) A monthly rate shall be multiplied by 12 to derive an annual rate.
(b) An annual rate shall be divided by 52 to derive a weekly rate.
(c) A weekly rate shall be divided by 40 to derive an hourly rate.
(d) A daily rate shall be derived by multiplying an hourly rate by the number of daily hours of service required.
Pursuant to that supplement, employees of The Alaska Railroad whose salaries had been fixed on a monthly or yearly basis were thereafter paid on an hourly basis.
*573 24. On February 11, 1946, the acting general manager of The Alaska Eailroad issued Supplement No. 1 to General Circular No. 574, which read as follows:
Pursuant to wage negotiations and Supplement No. 40 to Wage Schedule No. 16, effective July 1,1945, the overtime rates of pay and regulations pertaining thereto as promulgated in General Circular No. 574, of December 10, 1945, are administratively extended to employees of The Alaska Eailroad paid on a per diem and per hour basis, except Longshoremen at Seward and Whittier, train and engine service employees, Eska Mine hourly employees, and Eiver Boat employees.
On the same date the provisions of the above circular were incorporated in Wage Schedule No. 16 as Supplement No. 61 thereto.
25. Likewise on February 11, 1946, the acting general manager for The Alaska Eailroad issued General Circular No. 580 which read in part as follows:
Pursuant to wage negotiations and Supplement No. 40 to Wage Schedule No. 16, effective July 1, 1945, the hourly, daily, monthly, per annum and mileage rates of pay for employees of The Alaska Eailroad, shown in Wage Schedule No. 16 as amended by supplements No. 1 to 61 inclusive, are increased as follows:
1. Train and Engine Service Employees.
(a)All service except yard and snow service:

(b)Snow Service:

(c)Yard Service:

*574 The provisions in that circular with respect to pay for overtime for train and engine service employees were the same as those included in Wage Schedule No. 16 and set out in finding 20. That circular also provided for additional increases for various other employees including certain per diem and monthly employees.
26. Since General Circular No. 574 and Supplement No. 52 to Wage Schedule 16 provided for an administrative workweek of 48 hours with the first 40 hours constituting the basic workweek and with the hours in excess of 40 compensated at one and one-half times the regular rate, one result of the Federal Employees Pay Act of 1945 was to give to the employees of The Alaska Bailroad covered by that act an increase in compensation of approximately 30 percent. The wage rates provided in the circulars referred to in findings 24 and 25 were for the purpose of giving similar increases to other employees who had been held not to have been covered by the act, and also to place all of the employees on substantially the same basis as far as increases are concerned.
27. In 1947, The Alaska Bailroad employed labor consultants to make a survey of its wage rates and wage payment practices. After the publication of their report, the management of the railroad and representatives of its employees began protracted negotiations with respect to wage rates. They were unable to reach any agreement, and the matter was eventually referred to the Secretary of the Interior. April 30,1948, the Secretary of the Interior, after a hearing but without having secured the approval of the employees’ representatives, issued his Order 2424 establishing wage rates for the railroad employees, effective May 1, 1948, which in certain respects were increases over previous wage rates.
Subsequent wage increases were made on May 16, 1949, and on April 1, 1951, upon agreements reached between rej)resentatives of The Alaska Bailroad and the employees’ representatives and after approval by the Secretary of the Interior.
28. The positions of road service employees, such as each of the plaintiffs held during the major part of the periods covered by their respective claims, comprising the positions of engineer, fireman, conductor, brakeman, and baggageman, *575 are standard positions on all American railroads, and the experience and skill required of and tlie duties and responsibilities imposed upon such employees are basically the same on The Alaska Railroad as on other American railroads, with minor differences occasioned by the climate of and operations in Alaska.
A locomotive engineer of The Alaska Railroad is required to know his equipment, particularly the locomotive which he is operating, the road over which he is running, be thoroughly conversant with the operating rules and instructions of The Alaska Railroad, to have qualified himself in regard to those rules by having served a period as fireman and by passing a very comprehensive written examination regarding the rules, and to make sure that the rules are obeyed by himself and the personnel under him.
The prime function of a steam locomotive fireman is to provide steam and maintain steam pressure in the locomotive, and to provide an additional set of eyes for the locomotive engineer on the opposite side of the cab. He also has the responsibility to learn sufficient about the equipment so that he may become an engineer. He passes progressively severe examinations and after 900 days of service is required to pass a comprehensive mechanical examination in addition to the examination on the rules.
A train conductor is responsible for the safety of the train, is the train commander or superintendent. Brakemen are under his jurisdiction. He performs numerous clerical tasks. He must go through a period of apprenticeship as a brakeman for a minimum of 900 working days and pass various written examinations.
A train brakeman is an assistant to the conductor.
The duties of hostlers consist largely of round-house and shop switching and servicing engines both for yard and road service.
29. The plaintiffs were members of one or another of the standard operating railway brotherhoods. A customary method of handling grievances of union employees of The Alaska Railroad, situated as these plaintiffs were, was to present such grievances to the local lodges in Anchorage, Alaska, and, if the local lodges considered it advisable the *576 grievance would be presented by the local chairman to tlie grand lodge. This method was adopted with regard to the failure of The Alaska Eailroad to apply section 23 to its employees, as requested by the employees. Following the adverse decision of the Comptroller General of July 13,1934, referred to in finding 11, to the effect that section 23 of the act of March 28,1934, was inapplicable to employees of The Alaska Eailroad, representatives of the employees tried in various ways to have the decision reversed or to obtain the forty-hour week through the enactment of appropriate legislation, all of which efforts failed.
In their efforts to secure the benefit of section 23 of the act of March 28, 1934, both the local lodge and the grand lodge enlisted the aid of the Honorable Anthony J. Dimond, delegate of Alaska to the Congress, who not only conf erred with a representative of the Comptroller General in 1934 or 1935 but also introduced bills in Congress in 1936,1937,1939, and 1941 which would have specifically brought the employees of The Alaska Eailroad within the provisions of that act. In each case the Secretary of the Interior recommended against the enactment of these bills and none of them were enacted into law. Delegate Dimond advised the representatives of the union to carry their cases to court.
In a letter dated October 17, 1946, the plaintiffs through their attorneys made demand upon the Secretary of the Interior for payment for overtime work performed in excess of forty hours per week since March 28,1934, in accordance with the provisions of section 23 of the act of March 28, 1934. The first suits filed by members of the nonoperating group were those of Poggas v. United States, filed March 19, 1947, and Parmenter v. United States, No. 48567, and Nelson v. United States, No. 48566, filed February 26, 1948. The first suit filed by any of the operating employees to challenge the correctness of the Comptroller General’s ruling, heretofore referred to, was in the cases of David F. Samples, et al. v. United States, on April 22, 1948.
There was no lack of diligence on the part of the union of which the plaintiffs were members and which represented them in presenting their protest to appropriate officials at the seat of Government, short of filing suit.
*577 30. Traditionally, workers on American railroads, including The Alaska Railroad, are classified in two groups: (1) operating employees, and (2) nonoperating employees. Operating employees are the train and engine crews, i. e., the engineer, fireman, brakeman, conductor and road baggage-man, who operate and work upon the trains while they are in motion. The nonoperating employees include all other and the great majority of employees, such as maintenance-of-way, maintenance of bridges and buildings, shop craft, transportation (such as telegraphers, dispatchers, etc.), and clerical employees, etc.
31. Nonoperating employees of The Alaska Railroad are paid on the traditional time basis, that is, a fixed amount per month, per day, or per hour. Most of these employees, at least prior to July 1,1945, were paid on a monthly basis and rated as monthly employees. Prior to May 1, 1943, they were paid overtime on a straight-time basis, as shown in finding 14, and thereafter on a premium basis, as shown in finding 19 and succeeding findings. Plaintiffs Brayford, Silbernagel, O’Donnell and Cameron each worked for varying periods of time covered by the present claims as nonoperating employees. During their respective periods of nonoperating service, Plaintiff Brayford was employed on an hourly basis when working as a fireman in the maintenance-of-way department, as an engine watcher in the mechanical department, and a trucker in the operating department, and on a monthly basis when employed as a first-class helper and as a hostler in the mechanical department; Plaintiff Silbernagel was employed on an hourly basis when working as a pitman, laborer, and engineer in the maintenance-of-way department, and on a monthly basis when employed as a ledgerwood operator in that department; and Plaintiff Cameron was employed on an hourly basis when working as a truckman, porter, a section laborer, longshoreman, and carpenter, and on a monthly basis when working as a hostler helper.
32. Operating employees are classified in two groups: yard service and road service. Operating employees in yard service include the engineers, firemen, conductors, and brakemen who, in the yards, operate and switch trains, assemble and make them up, and otherwise either make them ready for *578 the road crews to take them over or break them up on arrival at their destination. On The Alaska Railroad, yard service employees are paid on the traditional time basis, that is, a fixed amount per month, day, or hour.
These operating employees in yard service were paid overtime for work in excess of eight hours a day and for work on Sundays and holidays regardless of the number of hours worked in a week at straight-time rates from before March 28,1934, to October 1,1943. As of the latter date and thereafter, they were paid overtime “for all time worked in excess of eight (8) hours per day on the minute basis, at one and one-half times the hourly rate”. As shown in finding 20, this latter provision with respect to overtime was incorporated in Wage Schedule No. 16, effective December 1,1943.
Each of the six plaintiffs whose claims are here considered worked at various times in yard service both before and after October 1, 1943. It was not unusual for work to be performed in yard service in the same week in which work was performed in road service.
33. Operating employees in road service are also classified in two groups: (1) assigned, that is, those with regularly assigned runs; and (2) unassigned or extra board employees. They are paid in accordance with the dual pay system hereinafter described. A new operating employee goes to the bottom of the extra board and remains on it until he has attained sufficient seniority to permit him to “bid” on some regularly assigned service either in the yard or on the road. On The Alaska Railroad, practically all road service employees are in assigned service, because assigned employees have regular earnings whereas unassigned employees do not, and in Alaska it is hard for the railroad to obtain employees who will accept unassigned service. All the plaintiffs were operating employees in assigned road service during the greater part of the periods involved in these proceedings.
34. On The Alaska Railroad, operating employees, including the plaintiffs, commonly and frequently transfer back and forth between all classes of road service and between yard and road service. These operating employees have the type of seniority rule in effect that if a job filled by an employee with higher seniority is discontinued, or a job which *579 had been filled with less seniority becomes vacant, the employee with higher seniority may “bid” on the lower seniority job, that is, he may apply for it and, if he is the applicant with the highest seniority, he is entitled to the position. In case of layoffs, employees with high seniority “bump” and replace employees with lower seniority. A brakeman who qualifies for a position as a conductor and a fireman who qualifies for a position as engineer have “double” or “optional” seniority in both positions. Thus, an engineer or conductor who, for his own reasons, regards as more desirable a position as fireman or brakeman on another run may, when a vacancy occurs in it, “bid” for the lower position and, if he is the applicant with greater seniority, he is entitled to receive it. For that reason, the same employee may, in a short period, serve as a conductor in passenger, freight, work, and snow service, or as a brakeman in any of those services, and as a conductor or brakeman in yard service, etc.
35. On The Alaska Bailroad as on other American railroads, during all periods relevant to this action, road service employees have been paid in accordance with what is called the “dual system.” Under that system on The Alaska Eail-road, for pay purposes, the standard speed for both freight ■ and passenger service is 12y2 miles per hour. One hundred miles represents a minimum day which, at the rate of 121/2 miles per hour, reflects a working day of eight hours. The basic unit in determining the rates of pay for road service employees set out in the wage agreements is so much per mile and from that unit is computed a rate per day, per hour and a monthly minimum. For example, in finding 20, the pay rate for engineers is shown at 11.44 cents per mile which, at the minimum day of 100 miles, produces the rate per day of $11.44 and an hourly rate for an eight-hour day of $1.43 ($11.44 divided by 8). At that time (1943) there was a monthly guaranteed minimum of 3,000 miles which, at 11.44 cents per mile, produced a monthly minimum of $343.20. The minimum guaranteed amounts are paid irrespective of whether the employee runs less than that number of miles.
On runs of more than 100 miles, whenever a train is operated at an average speed for the run eaual to or in excess *580 of the standard speed defined above, the train crew is paid on a mileage basis, that is, at so much per mile, regardless of the time consumed in transit. If a train operates on any given run at less than the standard speed, the train crew is paid (in addition to its mileage computation) additional compensation (at hourly rates) for the additional time required for the trip, that is, for the number of hours or minutes by which the actual time spent on the trip exceeds the distance traveled divided by 12-%.
The rule with respect to overtime pay for train and engine service employees, as set out in General Circular 516, effective October 1, 1943, and in Wage Schedule No. 16, effective December 1,1943, reads as follows:
On runs of one hundred (100) miles or less, overtime will begin at the expiration of eight (8) hours; on runs of over one hundred (100) miles, overtime will begin when the time on duty exceeds the miles run divided by twelve and one-half (12y2), all time to be computed daily. Overtime shall be paid for on the minute basis at an hourly rate of one-eighth (%) of the daily rate for passenger service and at an hourly rate of three-sixteenths (3/16) of the daily rate for all other classes of service.
Until October 1,1943, the additional dual system compensation paid to train and enginemen, hereinafter sometimes referred to as “dual system overtime”, was at straight-time rates regardless of the hours worked or miles run. Since that date, crews in passenger service have continued to be paid dual system overtime at straight-time rates, whereas those in other classes of service, such as freight, work or snow, have been paid at one and one-half times the prevailing rate.
The basic straight-time pay on yard service is computed by multiplying the schedule rate for one hour by the number of hours worked, with a daily minimum guarantee of eight hours.
36. The main line of The Alaska Railroad runs from Seward on the south to Fairbanks on the north, a distance of 470.3 miles. Spur lines run for short distances from points along the main line. For maintenance purposes the railroad is divided into sections of approximately eight to ten or twelve miles in length.
*581 For purposes of operation the railroad is divided into divisions as follows:

Miles

Seward to Anchorage-114.3
Anchorage to Curry-134.2
Curry to Healy_109.6
Healy to Fairbanks-112.2
In addition, there was a spur line division for passenger service from Portage to Whittier and return which was included in the run from Anchorage to Whittier and return for a round trip distance of 125 miles.
While earlier time tables were not furnished, a 1952 time table, effective June 1, 1952, for first-class passenger service, shows the schedule time for each division, the scheduled miles per hour, and from which is computed the equivalent hours for pay purposes under the dual pay system of operating employees for certain trains as follows:

The following tabulation shows similar information with respect to second-class passenger service on a trip from Seward to Portage and return on the same day:

Other trains, including local freight trains and snow and work trains, ran at lower speeds. The scheduled miles per' hour set out above were the average speeds to be main *582 tained in order to meet the train schedule. As will hereinafter appear, the speed of trains, prior to the time when The Alaska Railroad began a program of rehabilitation in 1947, was less than after rehabilitation was completed in 1949.
37. During the period 1947 to 1949, inclusive, The Alaska Railroad carried out a program of rehabilitation. Some preliminary work was carried out during 1947 but the major part was done during the construction seasons of 1948 and 1949. It consisted of the replacement of old 60 to 65 pound steel rails with 115 pound steel rails, the renewal and replacement of ties with treated ties, improvement of curve easements, and reballasting road beds and realigning track tangents. In addition, new rolling stock and equipment, both passenger and freight, was acquired including some fifty Diesel locomotives to replace steam locomotives previously used. The improvement of the roadbed was completed from Anchorage north to Fairbanks and the replacement of rails and ties was carried out from Portage to Fairbanks.
The carrying out of the above program of rehabilitation resulted in an increase in the operating speed of trains, particularly north of Anchorage, and produced a more favorable ratio of miles paid to the number of hours worked. However, these plaintiffs when engaged in work as operating employees in road service were paid to a greater extent on the basis of miles rather than hours prior to the period of rehabilitation as well as subsequent thereto.
38. During the entire period involved in these proceedings, road service employees in assigned service on The Alaska Railroad were on an administrative workweek of six days of eight hours each as herein defined. If work was not available for six days each week and these employees were available for work, they would nevertheless be paid on the basis of 100 miles as constituting an eight-hour day for each day not worked. The total-number of hours actually worked by such, employees per day or per week was irregular because the hours worked varied, among other things, on account of the length of the run, speed of the train and types of delay encountered. While under the dual system all miles, time and compensation are computed on a daily basis, prior to 1948 all' employees of The Alaska Railroad were *583 paid monthly and, since that time except for the period May 1,1948, to April 30,1949, when they were paid biweekly, have been paid semimonthly.
39. One effect of the operation of the rules referred to in the preceding finding is that the hourly earnings of operating employees in road service on trains traveling 12% miles an hour or faster increase as the speed of the train is increased, but where the average speed of the train is less than 12*4 miles per hour, the speed of the train up to that rate does not affect their hourly earnings. This dual pay system is an incentive system in the sense that it provides wage payments in proportion to miles run for runs exceeding 100 miles in length at speeds equal to or exceeding 121/2 miles per hour. In a general sense it is also a system under which wages of the employees covered thereby are computed on an hourly basis and on a mileage basis and the employee is paid whichever pays him the greater amount. If neither the hourly rate nor the mileage rate produces as much as the guarantee, the employee is paid the guaranteed amount. Under this system the average hourly earnings normally exceed the straight-time rate per hour because of earnings from arbi-trarios, dual system overtime and miles run at a speed in excess of 12% miles per hour.
40. Monthly Guaranteed Wage. In accordance with the practice on some American railroads, train and engine service employees in assigned service on The Alaska Railroad were guaranteed a minimum monthly wage. In the case of such employees in road service, this minimum monthly wage was computed at the mileage rates set out in the various wage schedules on a guaranteed mileage of 3,000 miles per month, which represented 240 hours to be paid for per month, from prior to June 1, 1932, until the first pay period following January 23,1949, when the monthly guaranteed mileage was changed to 2,600 miles, which represented 208 hours to be paid for per month. The minimum monthly wage for train and engine service employees in yard service was computed at thirty times the basic daily rate prior to May 1, 1948, and on and after May 1,1948, at twenty-six times the basic daily rate. Under those rules, if the pay earned on the basis of miles run or hours worked, whichever was applicable, should *584 in any month be less than the minimum monthly guarantee, the employee would nevertheless be entitled to receive the guaranteed amount. In other words, the mileage guaranteed represented miles or hours to be paid for as distinguished from hours of work.
41. Arbitrarles or Constructive Allowances. Also in accordance with standard practice on American railroads and at all times relevant to this action beginning prior to June 1, 1932, there have been in effect on The Alaska Eailroad certain working rules which establish what are called “arbi-trarles” or “constructive allowances.” Generally these rules provide payment for additional work performed for which other rules of the dual system do not provide, or they are designed to insure that train and engine service employees who have been called and have made themselves available for service shall receive pay for their time under certain conditions even though through no fault of their own they are not actually working. For convenience, they may be divided into two classes: (1) payment for arbitrarles in situations where no work was actually performed, and (2) payment for arbitrarles which represent the performance of actual work but which still represent time within the hours of actual work otherwise paid for.
42. Payment for arbitrarles in situations where no work is actually performed. This classification includes the following:
(a) Layover day. During all times relevant to this action train and engine service employees in assigned road and yard service were on an administrative workweek of forty-eight hours, that is, six days of eight hours each, and were paid on a monthly basis until 1948. The respective wage agreements provided that these employees would receive pay for eight hours or 100 miles for the seventh day at the same minimum rate as on other days provided the employee was not required to perform work on that day. In the event he was required to work on the seventh day, such work was paid for under the regular rules of the dual system in addition to pay for the layover day. The schedule of pay, rules and regulations governing train and engine service employees effective July 15, 1939, contains the following provisions *585 which are illustrative of the rules governing the layover day:
Rule 4. Days Worked per Month, (a) Crews shall not be required to work more than twenty-six (26) days per month, except in cases of necessity.
(b)Assigned crews shall be given one day layover per week, but in case of interruption to service due to delayed boats, wrecks, washouts or other track obstructions, crews may be used an equal number of days as called for in their assignment, and in the event that layover day is not given in accordance with the assignment it will be given at the earliest practicable date within seven (7) days from the day the layover is due. In the event that it would then be impossible to arrange a layover day within the above period, crews will be paid eight (8) hours or one hundred (100) miles for the layover day on which service was performed, in addition to payment for the service performed.
This rule was in existence from sometime prior to June 1, 1932, until it was abolished by the Secretary of the Interior, effective May 1, 1948, for yard service and for road service the first payroll period following January 23, 1949. Since those dates on which the layover day was abolished, train and engine service employees in both road and yard service have received overtime pay for work performed on the seventh day on the basis of one and one-half times earnings for that day under the regular operation of the rules.
(b) Minimum day. Payment for a minimum day when hours worked were less than eight or miles run less than 100. The difference between pay for hours worked and pay for total hours paid for is sometimes referred to as arbitrary pay for time not worked.
(c) Calendar day. Payments for a calendar day, meaning a guarantee of one day’s pay when a train and engine service employee was available for service but no work was available for him to perform.
(d) Called and not used. Payments for being called and not used, meaning a penalty payment for calling a train and engine service man for duty and then not providing work for him on that day.
(e) Eunarounds. Payments for being run around, meaning a penalty payment for giving a day’s work to a junior *586 employee when a senior employee was in fact entitled to such work.
(f) Tie-up between terminals. Payments for being tied-up between terminals, meaning payments for tie-up time due to wrecks, washouts, or snow blockades.
(g) Deadheading. Payment for deadheading, meaning a payment to an employee carried as a passenger from a point where he was not needed to a point where the manager of the railroad wished him to perform service.
(h) Used off assignment. Payment for being used off assignment, meaning a penalty payment for taking an employee off his regular assignment to perform other work.
(i) More than one class of service. Payment for more than one class of service, meaning an additional payment for performing more than one class of service within one day.
(j) Running through a terminal. Payment for running through a terminal, meaning payment for running beyond the assigned terminal point. The so-called arbitrary payment is the difference between the pay for hours paid for and for hours worked after running through the terminal.
43. Payment for arbitrarles which represent the performance of actual work but which still represent time within the hours of actual work otherwise paid for include the following;
(a) Initial delay. Payments for initial delay, meaning payments for time held in excess of thirty minutes between the time called and the time of the train departure.
(b) Initial work. Payments for initial work, meaning payments for the time spent in the performance of various duties, such as switching, between the time called and the time of train departure.
(c) Terminal delay. Terminal delay, meaning payments for time between the time of train arrival and the time the crew is released. All such time is paid for in freight service but only time in excess of fifteen minutes in passenger service.
■(d) Terminal work. Payments for terminal work, meaning payments for work performed between the time of train arrival and the time the crew is released.
*587 (e) Copying a train order. Payments for copying a train order, meaning a payment for copying a train order at points where no telegrapher or dispatcher is employed.
(f) Coupling and uncoupling air hoses. Payments for coupling and uncoupling air hoses, meaning payments to yard crews for coupling or uncoupling air hoses at points where car men are employed.
(g) Since May 16, 1949, additional compensation for operating heavier locomotives has been paid to Alaska Railroad firemen and engineers.
44. The Alaska Railroad’s payroll record for train and engine service employees is computed from daily time slips filled out by the engineer for himself and his firemen, and by the conductor for himself and his brakemen and baggage-men. These time slips, of which a stub is retained by the employee showing substantially the same basic data, contain information with respect to the time the crew was called for duty, the time the train left, the time of its arrival, the time of the release of the crew, the place or milepost number of the beginning and ending of the trip, the initial and final delay and work time, and the total miles for which pay is claimed, including excess miles, overtime, and arbitrarles. The time slips as used by the engineers and conductors have been similar in form over the period involved in these proceedings. The form in use in 1949 read as follows:

*588

The stub of that slip which is retained by the engineer read as follows:

The daily time slips are checked for errors by a railroad operations timekeeper who compares the hours worked and miles claimed with data on train movements from a summary of the dispatcher’s daily train sheets' and computes straight time, overtime and arbitrarles due in accordance with the dual system wage payment rules as contained in the applicable wage agreement. In performing that function, it is necessary for him to determine not only miles run but also hours worked since under the dual pay system heretofore described the train and engine employees in road *589 service are paid on the basis of miles or hours, whichever produces the greater amount, as more fully described under the discussion of the dual pay system. Doubtful items are submitted for approval or disapproval to the office of the superintendent of operations. Errors are corrected with notice to the employees affected and employees, or their representatives, may appeal an adverse decision. After the timekeeper has completed the work just described, the information obtained and determinations made by the timekeeper are forwarded by him to the accounting department as a basis for the preparation of the payroll for these employees.
45. As indicated in the preceding finding, the time slips, when properly filled out, contain information from which a determination can be made of the actual hours worked by the train and engine service employees in road service, without regard to how they may have been paid under the dual system. Likewise, similar information should appear on the stubs of these time slips which were retained by the employees. In some instances, employees retain stub books indefinitely and have them for their entire period of service involved in these proceedings, whereas others have retained them for only a relatively short time, if at all. However, the stubs vary as to completeness and accuracy and they are not checked by the timekeeper. Since the fireman’s time is kept by the engineer and the brakeman’s time by the conductor, in those cases where any of the plaintiffs were serving as a fireman or brakeman the stubs for those periods, if retained, would ordinarily not be in their possession. In addition, many of these employees kept personal diaries in which they record, often daily, pertinent information with respect to hours worked, miles run, wages due, etc., but these diaries likewise vary as to completeness as well as to character and accuracy of information recorded therein. The keeping of these diaries is not required by the railroad.
46. Prior to 1948 The Alaska Kailroad had preserved all of its payroll records for many years, including the engineers’ and conductors’ time slips and dispatchers’ train sheets *590 from which, as shown in finding 44, substantially all the information was obtained in order to compute wages due train and engine service employees in road service. In 1947 an auditor was employed who undertook a review of the entire situation relating to the records of the railroad, including a determination of what records might be destroyed. Up to that time none of the old records had ever been systematically destroyed and many of them were stored in warehouses in such shape that they could not be located without some difficulty. In addition, many of them occupied space which was needed for other purposes. On or shortly prior to April 3, 1948, the auditor just referred to began a destruction of certain records which, in his opinion, were no longer required by the railroad and which destruction was not prohibited by Federal regulation or statute. In carrying out the destruction, he followed the regulation of the Interstate Commerce Commission governing the destruction of records by other railroads. This action had the approval of the general manager of the railroad. On April 3, 1948, he supervised the destruction of conductors’ and engineers’ time slips from 1922 to 1944, inclusive, dispatchers’ train sheets from 1927 to 1936, inclusive, and for 1941, and on May 13, 1949, dispatchers’ train sheets from 1937 to 1940, inclusive, and 1942 to 1945, inclusive. On October 31,1949, engineers’ and conductors’ time slips from 1945 to April 30,1947, inclusive, were destroyed. All engineers’ and conductors’ time slips beginning May 1, 1947, and continuing until the present time have been retained by the railroad as well as dispatchers’ train sheets since and including 1946. At the time the auditor caused the destruction of these records, he was unaware of the suits pending in this court on account of claims for overtime of the type involved in these proceedings.
Consistent with a regulation of the Interstate Commerce Commission, The Alaska Bailroad has never destroyed any of its payroll records, that is, the records which were prepared from the information furnished by the timekeeper from the time slips and dispatchers’ train sheets and showed *591 the wages due its employees. However, it is not possible to determine from these records the number of hours actually worked each week by train and engine service employees in road service.
47. During the trial there was introduced in evidence schedules showing the information obtainable from the payrolls which are referred to in the preceding finding as having been preserved. These schedules were prepared for each of the plaintiffs for all periods each worked beginning in March 1934, or at such later period as they began working in the event they were not employed by The Alaska Eailroad on March 28, 1934, and continuing at least through 1947. These schedules were prepared on a monthly basis and showed hours or miles paid for depending on whether they were paid by the hour or mile, rates per hour or per mile, gross pay, job classification, department of the railroad in which employed, and leave allowed and paid for, both annual and sick. Since the plaintiffs not only worked at times during the period here involved in both the operating and nonoperating departments but also transferred back and forth to various positions within those departments, the information shown on those summary schedules would often reflect different rates, different bases, and different positions within the same month.
As illustrative of the character of information shown on those summary sheets, the following examples are furnished:

*592

*593 From information of the character set out above, where miles or miles and hours are shown for a given month, it is not possible to determine accurately how many hours the employee actually worked during the month or a given week. The payroll record of hours and miles paid for is always greater than the hours worked whenever arbitraries or dual system overtime is earned or miles are run in excess of an average speed of 12y2 miles per hour, because such arbi-traries, overtime and excess miles are included in hours paid for in terms of their straight time equivalents. Thus, all arbitrary hours are included in the payroll record as hours or miles paid for, one hour of overtime at time and one-half appears in the payroll record as one and one-half hours or 19 miles, and one hour at an average operating speed of 25 miles per hour appears on the payroll records as two hours or 25 miles paid for.
However, as shown in finding 45, some of the operating employees in road service kept daily diaries and stub books of the time slips which would aid in determining the time actually worked. For example, Plaintiff Farr had diaries covering the periods from December 6,1941, through July 12, 1952, and stub books covering the period August 26,1944, to March 13,1952, whereas Plaintiff Scanlon did not have daily diaries or stub books for any of the period.
48. The following summary is furnished from the monthly schedules referred to in the preceding finding in the case of Plaintiff Brayford as illustrative of the hours or miles paid for over the period 1934 to 1947, inclusive, and pay received:

*594

*595 49. For the period prior to July 1,1945, the date when the Federal Employees Pay Act of 1945 became effective, and during which period, as shown by the preceding findings, complete information was not always available as to actual hours worked though diaries and stub books were available for parts of the period, the plaintiffs submitted schedules through an expert witness showing how they would compute the amounts alleged to be due. As illustrative of some of the computations, a schedule was submitted on which appeared the following computation for February 1942 in the case of Plaintiff Farr:

Plaintiff Farr began work for The Alaska Railroad on December 6, 1941. During February 1942, he was in yard service where he was paid monthly but on an hourly basis. On the monthly summary sheets, under hours or miles paid for, is shown 4,100 miles and that divided by 12% miles per hour equals 328 hours, the total hours shown in column A, which agrees with the total stated hours and miles in Farr’s diary. The only evidence available with respect to layover days, arbitrarles, etc., is plaintiff’s diary which shows a stated number of hours and miles for each day in the month, ranging from 8 hours and 100 miles to 20 hours and 250 miles, but does not give any other detail such as hours of arrival and *596 departure. On the theory that at that time there was one layover day each week, that is, a day on which the employee would be paid when he did not work, the expert witness entered 8 hours in column B for each of the four weeks involved, that is, a total of 32 hours. The deduction of column B from column A left 296 net hours in column C. Column D, straight-time hours, in the amount of 160, represents four weeks of 40 hours each. The deduction of the straight-time hours from the net hours produced the amount of 136 shown as overtime hours in column E. In column F was shown the hourly rate applicable to plaintiff at that time of $1.043. Column G, straight-time rate due under sec. 23, represents an increase of the rate shown in column F by 20 percent in order to produce what is commonly referred to as a 48 for 40 adjustment as applied by the plaintiffs, that is, an increase in the rate for a 48-hour week which would produce a like amount of pay when such rate is applied to a 40-hour week.[2] Column H, overtime rate due under sec. 23, is V/2 times the straight-time rate shown under column G and purports to represent the rate at which these employees should be paid after 40 hours per week. Column I, compensation for layover days, sick leave and annual leave, represents the application of the rate fixed for these employees ($1.043) to the number of hours applicable to such days (32), thus producing the amount of $33.38. The compensation for straight-time hours worked, column J, is computed by multiplying the straight-time hours worked (column D) by the straight-time rate (column G), that is, the regular rate after the 48 for 40 adjustment. The compensation for overtime hours, column K, represents an application of the overtime rate shown in column H to the overtime hours shown in column E. The total of the three columns I, J, and K, produces the amount of $489.11 which *597 Plaintiff Farr contends should have been paid him for the month of February 1942. The difference between that amount and the amount actually paid him, $342.02, is $147.09, which he contends is due him in this action for February 1942.
50. An illustrative type of case prior to May 1947, where no information is available other than the payrolls (see finding 47), is that of Plaintiff Scanlon. The following information appeared on the monthly summary sheets as prepared by the defendant from the payrolls for August 1938:

In order to compute the amount claimed for that month, the plaintiff submitted the following computation:

The monthly summary sheet referred to above shows that he was paid the equivalent of 327.29 hours (234 hours and 40 minutes plus 92.624 hours (.1157.8 miles at 12y2 miles per hour)). In his computation under column A, the expert witness' assumed hours actually worked of 48 hours each week and a layover day of 8 hours each week. Since the month contained 31 calendar days and four weeks accounted for only 28 days, the three remaining days were carried over to the following month as 24 hours. Hours or miles paid for *598 in excess of those used in the computation were disregarded in determining the amount claimed in order to allow for arbitrarles which may have been included in the total hours and miles paid for. Straight time, column B, is shown as' 40 hours for each week and overtime as the difference between that amount and the hours shown in column A. The amount shown for the rate paid, column D, is the rate as shown on the payroll record. Column E represents plaintiff’s application of the so-called 48 for 40 adjustment. The other columns are self-explanatory from the headings in each column.
In this type of computation, where only miles were shown as paid, miles in excess of 3,000 per month, the guarantee in effect during this period, were disregarded. Where only hours were reported, all hours were used up to October 1, 1943, but thereafter limited to 240 hours per month unless available time stub records showed greater hours, in which event all hours would be used. The hours or miles' converted to hours paid for during the month and used in the computation were arbitrarily allocated to weeks falling within such month and days remaining from even weeks were carried over to the following month.
In the case of all other plaintiffs except Farr, for which the type of computation set out in finding 49 was used, the plaintiffs used the type of computation set out in this finding in order to compute the amounts claimed to be due for all periods prior to July 1, 1945. Under the Farr type of formula, the total compensation alleged to be due under section 23 of the 1934 act is first computed and from that amount is deducted the total amount paid in order to arrive at the net amount due and claimed in this proceeding. In the type of computation set out above in this finding, the amount due is computed by multiplying the straight time and overtime hours worked by the differences between the old and new rates for straight time and overtime as determined under the formula used.
51. As illustrative of the type of computations submitted by the plaintiffs for the periods after June 30, 1945, where the plaintiffs do not contend for the 48 for 40 adjustment, the computation of Plaintiff Farr for February 1948 is set *599 out below. For that period the time slips were available so that it was possible to determine the actual hours worked. The weekly summary for that month as prepared by the defendant for that plaintiff was as follows:

In order to compute the amount claimed for that month, the plaintiff submitted the following computation:

Column A, total hours, represents the total hours or equivalent paid for under the dual system as computed by the plaintiff from Farr’s stub book. In this instance, as in others, differences existed between the hours or miles paid for as shown in column A by plaintiff’s exhibit and those shown on defendant’s weekly summary schedule hut it is not possible from the evidence to reconcile the two amounts. Col-, umn B, layover, arbitrarles, etc., represents the difference between hours worked as shown on defendant’s weekly sum: mary and the hours shown by plaintiff in column A. The straight-time hours shown in column C represent a week of 40 hours plus the hours shown in column B. Overtime hours, column D, represent the difference between the total hours, *600 column A, and straight-time hours, column C. It will be noted that the overtime hours for the week of February 7, 11.75, are likewise the difference between 40 hours and the hours worked as set out above from defendant’s weekly summary, and that is true for each of the other weeks for that month after adjustment for the six hours allowed for deadheading from Curry to Anchorage on February 15. The straight-time hourly rate, column E, is taken from defendant’s weekly summary sheet as set out above, that is, the mileage rate multiplied by 12y2 in order to produce the hourly rate. The overtime rate, column F, is iy2 times the straight-time rate shown in column E. Columns G, H, and I are self-explanatory. The total compensation paid is taken from defendant’s weekly summary. For the first week, the total compensation computed as due, $131.92, exceeds the total compensation paid, $129.36, by $2.56 which represents the amount claimed by the plaintiff for that week. In each of the other three weeks, the total compensation computed as due is less than the amount paid under the dual pay system and no amount is claimed for any of those weeks, but the excess amounts paid for those three weeks are not applied as offsets against deficiencies claimed for other periods.
52. As heretofore shown, some of the plaintiffs kept the stub records for the greater part of the periods involved and from these stub records, when properly filled out, it is possible to compute the hours actually worked. Discrepancies would of course exist between the time shown on these stub books as compared with the time actually allowed where some adjustment was made in the time slip and correction thereof was not made by the employee on his stub book. However, without making any allowance for adjustments which may have been made of the information shown on the stub books, the following summary is shown from the stub books of Plaintiff Brayford of the time worked during the period 1941 to 1945, as an engineer in road service, showing hours actually worked computed weekly, total hours including hours allowable if allowance is made for one and one-half time for overtime in excess of forty hours a week, hours and equivalent of hours in miles paid for under the dual system for the *601 same period when thus serving as an engineer, and the net excess of hours paid for under the dual system:

53. As shown in the preceding finding, where the amount paid under the dual pay system was more for given weeks than that computed by the plaintiffs under their application of section 23 of the 1934 act, the plaintiffs are making no claims for those weeks even though during those weeks they worked more than forty hours.[6]
For the period beginning with the week ending May 10, 1947, and continuing to the end of 1951, for which time slips and complete payroll records were available, the defendant submitted, as heretofore shown, weekly summaries of hours worked, compensation paid, etc., of the character set out in the first paragraph of finding 51, for Plaintiff Farr for February 1948. On the basis of that information, the following summarization is furnished for that period of hours worked, hours earned on the basis of a forty-hour week with time and one-half allowed for hours in excess of forty, equivalent in hours paid for under the dual pay system, and net excess or deficiency in hours paid for to each plaintiff under the dual pay system as compared with hours to be paid for under a forty-hour week with time and one-half allowed for hours in excess of forty:

*602

54. In those cases where prior to July 1,1945, information is available as to total hours worked, hours paid for arbitrages, layover days, sick leave and annual leave, and miles converted to hours, the proper basis on which to compute the overtime pay allowable for train and engine service employees for a given week is shown by the following hypothetical example:
A. Total hours paid for_ 75
B. Honrs paid for arbitrarles, layover days, sick leave and annual leave_ 18
O. Actual hours worked_ 54
D. Straight-time hours_ 40
*603 B.Overtime hours_ 14
P. Bate paid_ $1.00
G. Straight-time computed under section 23_ $1.20
H. Overtime rate due under section 23- $1.80
I. Compensation for arbitraries, etc. (BXP)_$18.00
J. Compensation for straight-time hours worked (DXF)_$40.00
K. Compensation for overtime hours (EXH)_$26.20
L. Total compensation (I+J+K)-$83.20
M. Total compensation paid_$75.00
N. Net amount due (L minus M)_ $8.20
For periods after July 1, 1945, where similar conditions prevailed, the same computation may be used except that the adjustments called for by Line G should be omitted and the overtime rate determined as one and one-half times Line F.
55. In those situations prior to July 1, 1945, where records are not available showing hours actually worked and where miles, or hours converted to miles, paid for equal or exceed the guaranteed minimum mileage in effect for a given period, a reasonable basis on which to compute the overtime pay allowable for train and engine service employees for a given week is shown by the following hypothetical example:
A. Hours of administrative workweek_ 48
B. Straight-time hours- 40
C. Overtime hours- 8
D. Bate paid per hour-$1.00
E. Straight-time rate computed under section 23-$1.20
P. Overtime rate due under section 23_$1. 80
G. Difference between correct overtime rate and rate paid (F minus D)_$0.80
H. Overtime compensation due (GXC)-$6.40
' For periods after July 1, 1945, where similar conditions prevailed, the same computation may be used except that Line E should be omitted and the overtime rate determined as one and one-half times Line D.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.

 As heretofore shown, prior to May 1, 1948, all operating employees of The Alaska Railroad were paid at rates based on calendar periods of twelve 30-day months and 360 days a year. During the same period, these operating employees were on an, administrative workweek of 48 hours, consisting of six days of eight hours each. The hourly and mileage rates determinable on the basis referred to in the first sentence above, when applied to weekly periods, would accordingly represent 56 hours’ pay for six days of work of 48 hours. In. order to have the rate of pay, previously applied to the 56-hour calendar week Increased so that when applied to a 40-hour week equal pay would result, it would be necessary to increase the rate by 40 percent instead of by 20 percent as applied by plaintiff in the above computation.

 While the parties submitted evidence as to the amounts, if any, due for the six plaintiffs involved in these proceedings as well as proof on the question of liability, in view of the differences between them not only on the question of the applicability of section 23 of the 1934 act to operating employees but also, in the event it is. held applicable, how such amounts should, be computed and for what periods, no attempt is made to compute amounts due pending a decision by the court on the questions, among others, just referred to.

 In the hours paid for there was Included a layover day of 8 hours each week.

 Brayford worked as hostler engineer during the period January to June 1945 and no stub records were available for the period of such employment.