William T. **ANDERSON** et al.

v.

The **UNITED STATES**, United Transportation Union, Intervenor.

No. 480–69.

United States Court of Claims.

Jan. 23, 1974.

Ray R. Murdock, Washington, D. C., atty. of record for plaintiff. Joseph A. Klausner, Washington, D. C., Clyde C. Houston and Houston & Lytle, Anchorage, Alaska, of counsel.

Judith Ann Yannello, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Lester P. Schoene, Washington, D. C., atty. of record for intervenor. Edward D. Friedman, William H. Horkan and Bernstein, Alper, Schoene & Friedman, Washington, D. C., of counsel.

Before LARAMORE and DURFEE, Senior Judges, and NICHOLS, Judge.

NICHOLS, Judge.

Plaintiffs are former and present operating employees of the Government

owned Alaska Railroad. They brought this action to recover overtime pay they say is owed them under 5 U.S.C. §§ 5544. 6102. The United Transportation Union has been allowed to intervene, and will be referred to as "intervenor" hereafter, though possibly it is really here as an amicus curiae. It says it is a national railway labor organization and is the authorized representative of various crafts of employees of the Alaska Railroad and other railroads, including all the plaintiffs. It has a contract with the Alaska Railroad including a disputes procedure, which the plaintiffs have not followed. It says the assertion of plaintiffs' claims interferes with it in the performance of its duties. Its position on the issues in litigation will be noticed hereinafter when we discuss these issues.

Plaintiffs and defendant have filed cross motions for summary judgment. There are no fact issues requiring trial. We conclude that defendant's motion should be allowed, and the petition dismissed.

Counsel are to be commended for their able exposition of the pay system under which plaintiffs operate. It has become possibly the most complex mode of calculating compensation for personal services that the mind of man has ever devised. It is best understood by an exposition of how it got that way, and we do this before discussing the issues in dispute.

Up to 1956 the Alaska Railroad used for its operating employees the dual system of compensation which we are told is common among American railroads. It denied that the then current Federal overtime laws had any application to these employees. However, in Samples v. United States, 135 Ct.Cl. 548 (1956), this court held they did apply. In that case, at p. 550, Judge Madden describes the dual system as follows:

Under the dual system of pay, 12½ miles per hour is regarded as the standard speed of a train, and 100 miles of travel produces the same pay as eight hours of work paid by the hour. If it takes the train more than eight hours to travel the 100 miles, pay by the hour will be greater, and that computation will be used. If, as is not unusual, the train completes the journey in less than eight hours, pay by the mile will be greater and that computation will be used.

It may be added that every man's rate is stated initially as a rate per mile, and he is often said to have earned so many miles. The hourly rate is the mileage rate times 12.5. Thus a mileage rate of $.3720 is an hourly rate of $4.65. This hourly rate would govern in case of work in the yards, or switching, or on a train slower than 12.5 miles, but mileage governs for a fast, long run. If a train went 200 miles in eight hours the man having the $.3720 rate would earn 200 times that figure, or $54.40. This would be $6.80 for each hour worked. Nevertheless, it is clear from Judge Madden's opinion and calculations in the findings that the basic hourly rate for overtime calculations was always 12.5 times the mileage, i. e., $4.65 in the example given. Dual system overtime was only payable for stationary work, or on a slow train, where the advantageous mileage figure was not applicable. We are told this system was evolved to give operative railroad employees an incentive to move their trains rapidly, instead of the disincentive the straight hourly rate with overtime would supply.

The dual system also required certain extra payments to employees called "arbitraries", and they will be so called hereinafter. The term does not, as might at first be supposed, imply any criticism as to the reasonableness or justness of payments under that head. These too were in accord with standard practice on American railroads. They involved payment as for work in certain situations where no work was performed, or else payments for actual work done within hours of actual work otherwise paid for. An example of a contract "arbitrary" is "Tie up between terminals" which is worth 100 miles, i. e., 100 x the employee's mileage rate of pay. A

brakeman gets 15 miles for uncoupling an airhose, which may take him one minute. "Used off assignments" is worth 100 miles added to other dual system miles earned.

This court held in *Samples* (p. 552) that the employees were entitled to extra compensation under the overtime statute whenever the actual hours worked exceeded 40 per week, and the overtime was computed at time and a half the basic rate, *i. e.*, 1½ x mileage x 12½. It held that the "arbitraries" were disregarded in ascertaining the basic hourly wage.

> * * * The arbitraries are items conceded to the employees by their superiors for reasons which seemed sufficient to them, and have no relation to the policy of the forty-hour week, with overtime, * * *

For the same reason, the arbitraries were disregarded in comparing the dual compensation with that prescribed by the statute, so that plaintiffs were held entitled to judgment for any excess of regular pay for 40 hours, actual time, plus statutory overtime, over compensation paid under the dual system, not counting arbitraries. Thus, in view of the arbitraries, the actual compensation could considerably exceed the basic hourly earnings plus statutory overtime, as a result of the decision.

The intervenor tells us it viewed our decision with some alarm. It believed the court was putting the Alaska Railroad under heavy pressure to abandon the dual system of compensation and pay a straight hourly wage, with statutory overtime, but no mileage and no arbitraries. It believed the dual system, with arbitraries, was of value to the employees, as well as to management, and that some concessions should be made to preserve it. The result of this was an undertaking in a new collective bargaining agreement providing for statutory overtime whenever it was more favorable than the dual system, but preserving the latter otherwise. It was further agreed that the arbitraries would not be added in any instance where an operating employee was paid statutory overtime rather than under the dual system. If the dual system, plus the arbitraries, produced a result exceeding the statutory system, payment would be under the dual system, with arbitraries. This is the system which, with union consent, has been effective on the Railroad since 1957, and which has permitted the payment of mileage and arbitraries to continue.

This statement, oversimplified perhaps in some respects, suffices to show the problems, the background, and the evolution in the position of the parties. We turn now to the issues placed before us in these cross motions; counsel agree that they fall under four heads.

I

▮ Plaintiffs say that the impact of mileage upon actual hourly earnings must be fed into the computation of the basic hourly rate, which is used in computing statutory overtime. Thus, for the $.3720 per mile employee already mentioned, who serves 8 hours on a train which travels 200 miles, the basic hourly rate they say is not $4.65 but $6.80. Any escalation in earnings resulting from the mileage system, as applied in the case of a fast train, is escalated again in any overtime that may be earned.

The intervenor says that by sustaining this contention we would destroy the dual system beyond the possibility of preservation. This is opinion, of course, but it does appear plausible and plaintiffs do not effectively refute it. They are also seeking a windfall from what they hope to show is a mistake of law, that would not have befallen them, had the Railroad construed the law correctly all along. Such windfalls are not, however, unheard of in overtime litigation, and construction of the law to avoid them is not in any way mandated. The words chosen by Congress, if unambiguous, must prevail, with narrow exceptions not here relevant.

It seems clear, also, that under plaintiffs' theory an operating employee's

basic hourly rate would be a different figure for every train journey he took. Apart from overtime, complications can be imagined in other areas, as *e. g.*, in computing retirement annuities. Nor is it clear how the Wage Board could fix the wage in advance in accordance with prevailing rates, as § 5544 says it must. With a system already so complicated, additional complication is perhaps of little moment, but perhaps is to be avoided if possible.

Defendant relies heavily upon *Samples, supra*, where it appears hourly rates were everywhere calculated as the straight mileage rate x 12½. At p. 554, Judge Madden says the straight time rate had been calculated "commensurate" with the statute since 1945, and no recomputation of it was necessary for purposes of the case before him. It does not seem that the point plaintiffs now make was made then. He was approving, as to that particular, an administrative practice already 11 years old, and it appears another 13 years were to pass before anyone challenged it.

Plaintiffs rely on decisions as to the nature of the basic rate for overtime calculation, under the Fair Labor Standards Act, 29 U.S.C. § 207 and the Public Contracts Act, 41 U.S.C. § 35. It has been held that a bargained regular rate of pay must yield before a calculation of actual earnings per hour worked. Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942); Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944); Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945). In the last cited case there was a contract "basic rate" but an alternative piece-work rate that generally produced larger earnings and it was held the overtime must be computed on the actual hourly piece-work earnings.

Defendant says the Railroad work is not piece-work and that Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716 (1942) is more similar to the facts of this case. There a basic pay was provided but there was a $40 per week minimum guarantee, only exceeded if the employee worked over 54 hours. The Administrator argued that in reality that $40 was a fixed salary for an irregular work week, but the Court held that it would not provide a rigid definition of a "regular rate" when Congress had not done so. It would allow the widest possible scope to good-faith agreements.

These early cases under the then new Wage-hour Law all involved more or less obvious subterfuges, generally a paper basic rate that rarely controlled in practice. Here, however, we have an hourly rate which actually controls the earnings for a large number of the hours worked. The Wage Board or like administrative authority that per § 5544, fixes the rate of pay, is a Government agency entitled to the presumption of regularity of official action and may not have subterfuge imputed to it. The parties, bargaining in good faith have provided a mileage rate as an incentive for taking a train speedily over a long distance. As the Court said in Walling v. Belo, at p. 635, 62 S.Ct. 1223, we should not insist on an inflexible and artificial interpretation of the Act, where it will impose a pay scheme not suited to the needs of the industry as well as what the parties can agree on among themselves. Mr. Justice Frankfurter said, concurring, in Walling v. Harnischfeger Corp., 325 U.S. 427, 433, 65 S.Ct. 1246, 1250, 89 L.Ed. 1711 (1945), a contract rate will be respected "provided it is not a mere artifice unrelated to wage-earning actualities." We note that the statute here involved speaks in terms of a "basic" rate of pay. The word "basic" not being found in the Fair Labor Standards Act. Moreover, the latter now requires, as the statute here under review does not, that a contract rate, if used, must be "substantially equivalent to the average hourly earnings of the employee." § 207(g)(3).

Plaintiffs' argument proves too much in the sense that if they are right, surely arbitraries too ought to be cranked into

the computer to find the basic hourly rate. This would be clearly contrary to *Samples* and plaintiffs do not even urge it here.

Though the point is far from being frivolous, we conclude on the whole that defendant and intervenor are right, plaintiffs wrong. We regard the issue as more or less *res integra*, authorities cited dealing with wholly different fact situations, and laws written to overcome subterfuges not found in direct Government operation and employment, such as we have here. We are told the dual system of compensation, here involved, is similar to that which obtains on privately owned railroads. Yet the courts have not had to grapple with the issues we have here, because the Fair Labor Standards Act and any like wage-hour and overtime legislation do not apply to operating railway workers. We are certain that in including employees of Government owned railroads within the coverage of Government employee overtime legislation, the Congress did not wish to disrupt a system of compensation worked out in bona fide collective bargaining, suited to the needs of the industry, and acceptable to the employees. In statutory construction, unless the language is compelling, as it signally here is not, it is well to avoid interpretations no one can believe the Congress could have intended. The occasional instances of Congress inadvertently saying the wrong thing raises problems for courts which happily do not confront us here. The language is general and indicates an expectation that the courts will give it a rational and workable meaning in the infinitive variety of foreseeable and unforeseeable circumstances, and that we try to do here.

## II

The next issue relates to arbitraries. As we have seen, the judgment in *Samples* was that they were neither basic pay nor overtime. In determining whether pay under the dual system satisfied the overtime statute, arbitraries were not counted. The right of the employee to benefit from them was the same, whether his pay was set under the dual system, or under the statute. However, in contract negotiations after *Samples* the union, to save the arbitraries, agreed in effect to waive them whenever compensation was awarded under the statute, and in comparing dual system and statutory compensation, to see which was more favorable, arbitraries would be counted only on the dual system side. The plaintiffs argue that this agreement was obtained by coercion, because they lacked the right to strike, but intervenor scoffs at this. A triable issue of fact is not presented because a pay system that otherwise satisfies the statute would not do so any the less if established by the employer's unilateral fiat and on the other hand, a pay system that violates the statute is not saved if the employees agreed to it. In construing the statute, in marginal cases, as indicated above, the factor of bona fide agreement may have weight, but we do not deem the instant dispute to deal with such a marginal issue.

Both sides agree *Samples* is the law, and no overruling or modification is suggested. It does indeed appear to us well thought out and manifestly sound. Both parties base their positions as to this issue on *Samples*. Plaintiffs say, of course, that *Samples* gave the employee a right to arbitraries even when receiving statutory overtime. The agreement subsequent to *Samples*, therefore, attempted to waive a statutory right. In effect, the use of arbitraries in computing compensation to *Samples* plaintiffs, is by this view frozen into the law. Defendant says, if plaintiffs receive their basic pay, correctly computed, with time and a half for hours over 8 a day and 40 a week, the statute is satisfied. Since, as quoted above, this court held that the arbitraries have nothing to do with the policy of the statute, clearly the statute leaves the parties free to abolish arbitraries, or continue them as before, or modify their incidence, as they may agree or as the employer may decree, in the absence of agreement.

Plaintiffs in the *Samples* case, who got statutory overtime and also arbitraries, did so because there was at that time no agreement, custom, or practice, making arbitraries other than uniformly applicable. Now there is. There is no law cited to us that an employer who concedes a statutory right may not partially recompense himself by curtailing benefits in other areas not prescribed by statute. If his position had the look or smell of assessment of a penalty for assertion of the right, that might be a different question, as to which we express no opinion, but that is not the situation here. The employees' bargaining representative made the agreement he did to save a system of compensation he thought more advantageous to the employees than the statutory system. Actually, plaintiffs' concession in *Samples*, and again here, that arbitraries are not cranked into the computation of the basic hourly wage, makes their position here untenable. If they don't get into the case by that route, there is no rational way they can get into it at all.

### III

■ A further issue concerns the arbitrary know as the bi-weekly guarantee. A guarantee of pay for not less than 1200 miles per two week pay period at freight service rates is given to the Railroad's "Extra Board" employees. It is considered desirable to be on "Extra Board" and employees assert seniority to get on it. Plaintiffs are or have been on it. In exchange for such guarantee the employees participate in an on-call arrangement, where they are free to come and go as they please, as long as they report for work on 90 minutes notice at anytime of day. The 1200 mile guarantee is set off against all compensation actually earned, including arbitraries, straight time and overtime. If an employee should miss a call he is penalized 100 hours pay, held off the Extra Board for 24 hours and placed at the bottom of the Extra Board rotation roster. He is not called again until his name comes upon the list. If he repeatedly misses calls he is subject to discipline.

Plaintiffs contend that hours of on-call time (*i. e.*, awaiting calls) on Extra Boards exceeding 40 a week should be compensated for at overtime rates under 5 U.S.C. § 5544, since Extra Board employees are in substance engaged to wait. They argue that a trial judge should take evidence on the issue of whether or not Extra Board employees are engaged to wait. Cited as authority are Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), and Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944). Defendant argues that based on this court's decisions it is entitled to judgment as a matter of law.

In Aldridge v. United States, 479 F.2d 1365, 1367, 202 Ct.Cl. ——, —— (1973), Trial Judge White said in language the court adopted as its own *Per Curiam:*

* * * it is my opinion that considerable violence to the English language would be done by a holding to the effect that the plaintiffs were engaged in "work" for the Government while they were attending church services, or making purchases at grocery stores or watching shows at theatres, or visiting the homes of friends, or entertaining friends in their own homes or pursuing hobbies at hobby shops, or swimming at swimming pools, or participating in social activities at social clubs, or playing golf at golf clubs, or getting haircuts, or bowling at bowling alleys, or carrying on in their own homes whatever activities in the way of recreation, diversion, or relaxation that might suit their fancy.

The plaintiffs' situation is readily distinguishable from that involved in other cases where employees were required to remain at a specific place designated by the employer while awaiting a possible need for their services, and the courts held that the waiting time, although not productive, constituted compensable hours of work

(*e. g.*, Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944); Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); [other cites omitted]).

Plaintiffs distinguish the *Aldridge* case on the ground that there the claimants got no pay for waiting for a call, *per se*. Here, they assert, they do, making their waiting compensable work. There is, however, no pay for waiting in the instances which must be the majority, where work over 1200 miles is actually done. If less than 1200 miles is done and an extra payment is made to satisfy the guarantee, it is just another arbitrary, already held (see above) to have nothing to do with the policy of the overtime law. There are, indeed, several other arbitraries that deal with waiting situations. Such an arbitrary does not suffice to transform nonworking into working time; the Federal law on overtime deals with realities.

### IV

The last issue relates to the calculation of the number of overtime hours where some are admittedly performed. It is another *res integra* issue and it rises out of the overtime law, as amended in 1962, too recently for authoritative court interpretation to be available to us on the issue involved. By 5 U.S.C. § 5544(a) compensation for a Wage Board or similar employee is for "overtime work in excess of 8 hours a day or 40 hours a week". Before amendment by the Work Hours Act of 1962, Pub. L. 87–581, only work in excess of 40 hours a week was compensable. The question can be stated as whether hours that are overtime because of the 8 hours provision are nevertheless counted in determining when the 40 hour weekly figure is exceeded. For example, suppose an employee works as follows:

| | |
|---|---|
| Monday | 10 hours |
| Tuesday | 8 hours |
| Wednesday | 8 hours |
| Thursday | 8 hours |
| Friday | 8 hours |

Both sides concede that he worked two overtime hours on Monday. However, per defendant, these two hours, the ninth and tenth, are excluded from the "regular" hours and these being 8 hours each day, the 40 hour weekly maximum is not exceeded, and the employee earns two overtime hours only. Per plaintiff, however, the allowed 40 hours weekly are used up upon completion of the sixth hour Friday, and the seventh and eighth hours that day are also overtime, making four hours in all. Intervenor supports plaintiff on this issue, though saying it would not have intervened for this issue alone.

Questioning from the bench revealed that plaintiffs and intervenor would interpret the statute differently in another situation. Vary the illustrative case given above as follows:

| | |
|---|---|
| Monday | 8 hours |
| Tuesday | 8 hours |
| Wednesday | 8 hours |
| Thursday | 8 hours |
| Friday | 10 hours |

Plaintiffs would claim for two hours only, conceding that the last two on Friday were the only ones entitling the worker to overtime compensation. Intervenor would make a double award, triple time apparently, for these two hours, converting them into four, as they represented excess over both the allowable daily and weekly hours. Thus, per plaintiffs, the worker would lose two hours overtime pay by the happenstance of the 10 hour day being Friday instead of Monday, while intervenor would correct this by a somewhat startling gloss on the statute. Of course, the illustration gives defendant no problems.

According to counsel's surmise, defendant's interpretation of the statutory language results from the conceptual difficulties, as illustrated above, that ensue if defendant's interpretation is abandoned. At any rate, there can be no doubt that defendant has interpreted similar language in other statutes as it now does the statute here involved. Thus Department of Labor Rulings and Interpretations No. 3 (Jan. 31, 1961) is quoted, construing the Public Contracts

Act, as saying that if an employee under that Act has worked ten hours a day for six days he has worked 20 hours overtime. Under plaintiffs' view herein, of course, it would be 28.

It would appear to accord the statute an interpretation according to its terms to compute overtime earned each week by the day, taking the sum of the hours worked over 8 in any days, then by the week, the total of hours worked in the week over 40, and then award the employee the larger figure. In any event, the plaintiffs' interpretation cannot be correct and must be rejected. The daily and weekly figures surely cannot simply be added together, whether or not the happenstance is that the hours counted in the daily and in the weekly figures are the same hours. It is absurd that the employer should sacrifice his ability to get forty hours work at the regular rate if he calls for overtime at the beginning of the week, but not do so if he calls for it at the end. Statutes must, if their text permits, and sometimes even when it doesn't, be construed to avoid absurd and whimsical results, unrelated to the Congressional purpose. Church of Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). The Congress might possibly have intended in overtime legislation of the 1930's to compel the employer to spread the work around to the maximum extent feasible, by heavy pecuniary penalties for failing to do so, but it is hardly to be supposed it intended to penalize the United States Government in 1962. The 1962 amendment was, we believe, primarily to benefit the members of the Government's work force, not to compel the parcelling out of portions of their work among strangers.

In view of the foregoing, defendant has not incurred liability to make overtime payments to the plaintiffs in any of the four ways discussed above. Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is allowed. The petition is dismissed.

* Judges Kunzig and Bennett dissent as to the denial of defendant's motion for rehearing