The UNITED STATES of America, Appellant,

v.

The GOSHUTE TRIBE OR IDENTIFI-ABLE GROUP, Represented by the Confederated Tribe of the Goshute Reservation, Appellee.

Appeal No. 6–74.

United States Court of Claims.

March 19, 1975.

Dean K. Dunsmore, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for appellant.

Robert W. Barker, Washington, D. C., attorney of record for appellee. Wilkinson, Cragun & Barker and Donald C. Gormley, Washington, D. C., John S. White, E. Foster DeReitzes, Washington, D. C., and John S. Boyden, Salt Lake City, Utah, of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge and NICHOLS, Judge.

ON APPEAL FROM THE INDIAN
CLAIMS COMMISSION

NICHOLS, Judge.

The United States has appealed from a decision of the Indian Claims Commission, 31 Ind.Cl.Comm. 225 (1973), awarding The Goshute Tribe Or Identifiable Group, Represented By The Confederated Tribe Of The Goshute Reservation (hereinafter The Goshutes), the total

sum of $7,253,122, less credits for payments and for offsets, still to be determined, with respect to a tract of 5,952,000 acres in Utah and Nevada. The Commission determined that the taking or extinguishment date of that tract was January 1, 1875, and valued the premises at $5,980,122 as of then. It also awarded $1,273,000 as compensation for removal of minerals before the taking date. We affirm.

The appellant would support the $5,980,122 award if that were all, but challenges it if the predicated taking date of January 1, 1875, leaves open a further liability for prior removal of minerals. It denies that it is subject to the latter liability, as determined, but would fix taking date earlier than the one used, if necessary for entire compensation. It also claims the benefit of an estoppel, perhaps just as accurately a stipulation, that the mineral removal damages would not be claimed if the Commission selected January 1, 1875, as the taking date. We have given its contentions careful consideration but cannot sustain them.

The Goshutes were in aboriginal times part of the Shoshones, but the Commission has found that, as a distinct tribe or identifiable group, they used and occupied the involved area exclusively. They lacked a political organization larger than the village until continued white contact resulted in a loose tribal organization with a Chief. 11 Ind.Cl.Comm. 387, 407–08, 416 (1962). They now occupy reservations at Deep Creek and Skull Valley, 128,196.35 acres, part of their aboriginal heritage, and have so occupied them since approximately the selected taking date. 31 Ind.Cl.Comm. 225, 227 (1973).

The first non-Indian settlements in the area were established by Mormons in 1849, but there was no real development until the discovery of silver and other minerals there in 1863.

I

By the Treaty of Tuilla Valley, October 12, 1863, 13 Stat. 681, The Goshutes

and the United States agreed to establish peace and friendship. The Goshutes agreed to cease all depredations and that military posts, highways and a railway might be built through their territory.

Article 4 of the Treaty reads as follows:

> * * * It is further agreed by the parties hereto that the country of the Goship tribe may be explored and prospected for gold and silver, or other minerals and metals; and when mines are discovered they may be worked, and mining and agricultural settlements formed and ranchos established wherever they may be required. Mills may be erected and timber taken for their use, as also for building and other purposes, in any part of said country.

By Article 6, The Goshutes agreed to abandon their roaming life, live in reservations, and become farmers or herdsmen whenever the President should deem it expedient for them to do so.

By Article 7, the United States agreed to pay The Goshutes $1,000 per annum, in kind, for twenty years, to compensate them for the "inconvenience" of having their game driven away or destroyed, and by the formation of agricultural and mining settlements in their territory.

There is no finding of The Goshutes being driven off their land by force. Numbering 400 to 700, they occupied it but sparsely. Conditions became difficult for them for the reasons specified in the treaty. They became dependent on Government largesse. By the found taking date, January 1, 1875, they were substantially all in the reservations established for them.

Regular shipments out of silver ore began in 1869, when rail transportation became available. The Commission has found that the gross value of the minerals removed from the area before January 1, 1875, mostly silver, was $6,365,000 (at 304). The award for this represents a 20% royalty, the figure the Commission believes an owner could have demanded successfully. It has found that a prudent purchaser would on January 1, 1875, have paid $2,730,122 (at 301–02), for full ownership of the minerals not yet removed on that date. The remainder of the taking award, $3,250,000 (at 291), was for the surface values.

## II

The Commission says, and its figures substantiate, that the taking award reflects only the value of the minerals remaining on January 1, 1875, and excludes the value of minerals already removed on that date. The theory of Government liability for the pre-taking period is that the 1863 Treaty promising a derisory $1,000 a year (in kind, not money), for unlimited access to the minerals, then already discovered, plus highways, military posts, and the railroad, to ignorant Indians, represented dishonorable dealings under Clause 5, Section 2 of the Act, 25 U.S.C. § 70a(5). We think this is too self-evident to require demonstration. Appellant says, if the Commission thought the $1,000 was inadequate it should have proceeded under Clause 3 (unconscionable consideration), and would have had to take testimony as to the value of the interest conveyed by the Treaty to compare it with the consideration paid. This would require the Commission to do things the hard way since, apparently, it would have had to value the railroad right-of-way, the highway rights-of-way, the military posts, etc., all part of the interest conveyed. It presupposes that the various clauses of the Act are mutually exclusive and the Commission must select the right Clause at its peril. There may, we think, be cases, as here, where two or more clauses covered the same factual situation, and the Commission then enjoys discretion under which to proceed. If it selects the method less onerous as to proof, that does not establish that it has abused its discretion, however reluctant some may be to have these interminable litigations ever end. Our decisions specify that a "special relationship" is necessary for a "fair and honorable dealings" claim to accrue. *E. g.,* Aleut Community of St. Paul Island v. United States, 480 F.2d 831, 202 Ct.Cl. 182 (1973). Such a "special relationship"

arises when United States officials tender a Treaty to Indians for adhesion.

■ The instant Goshute claims were separated off from a 47 page petition originally filed on behalf of a variety of Shoshone tribal claimants. The counts relating to The Goshutes, paragraphs 34 and ff., show that The Goshutes originally claimed that title to their tract was recognized by the Tuilla Valley Treaty, *supra*. Possibly this position was abandoned at some point in view of Article 8, which says the Treaty is not to be construed as admitting the Indians had any other or greater title than existed in them upon acquisition of the territories from Mexico. At any rate, the petition directs the attention of the United States to the Treaty and to any loss the Indians suffered at the white man's hands respecting the territory described in the Treaty. The petition expressly alleges want of fair and honorable dealings, and that the United States disposed of the lands to settlers and others. We think the petition was adequate to inform the United States that dishonorable dealings might be asserted against it and that it might be held liable for depredations of miners acting under its authority or pursuant to the Treaty it had exacted. We reject the United States argument to the contrary.

### III

■ Appellant also urges an "estoppel" against appellee as regards its pre-taking royalty award for minerals. In 1969, when the Commission was considering what taking date to use, appellee's counsel said that actual mining in the area commenced in the middle '70's, that if the Commission selected 1914 as the taking date, as it then considered doing, appellee would claim the minerals removed before that date as a separate item, but that the 1875 taking date would allow award for the minerals as still in the ground. Manifestly appellee's counsel was ill informed as to what he would later prove. Indian claimants may know they once had a vast domain and now have it not, without being able

to supply details as to the steps the expropriation took. Experts must be retained for this and they must be given a taking date to work from. However, this statement was not offered with any accompanying colloquy that would enable us to say it was a stipulation of fact. There is nothing to show it was accepted as such. It is read by appellant as a promissory undertaking: if we can have the 1875 date, we won't claim for minerals removed before 1875 even if there were some. For counsel to give away part of his client's claim in that fashion would be most extraordinary, and the words should be read to avoid such a construction, if possible. They easily can be here. It was simply an unsound and fallacious argument such as we lawyers often utter. If appellant's counsel had been any better informed, he would have exposed the fallacy. The Commission's finding 27, tells why they selected 1875 as the taking date, and the percentage of minerals then in the ground plays no part in the finding. It is agreed that 1875 was not selected by stipulation of counsel.

### IV

The record shows that the appellant had ample notice how much appellee was going to claim for pre-taking removal of minerals. This was given on delivery of appellee's appraisal report in January 1971. Appellant refused to try the quantum of such recovery because it chose to rely on its denial of entitlement. See the Commission's order denying motion for rehearing, November 14, 1973, 32 Ind.Cl.Comm. 230.

### V

Appellant now says that in the case of the mineral locations, at least, the takings or extinguishments occurred, not January 1, 1875, but on the Treaty date, October 12, 1863, or on the dates of establishment of mining districts, or rather that they so occurred if the taking award of $5,980,122 is not all that is awarded. We assume *arguendo* that appellant does retain a right to challenge

the date in spite of the appearance of having committed itself to it, either in gross or in part as an average or composite date, and further that it can do so in this conditional or contingent manner.

There is one legal problem we fail to find adequately addressed by the Commission or by counsel and that is, what interest in the minerals did the Indians part with by the Treaty of Tuilla Valley? Some expressions in the almost indistinguishable companion case of Western Shoshone Group v. United States, 29 Ind. Cl.Comm. 5, 45, 46 (1972) construe the Ruby Valley Treaty, there involved and containing language like ours, as granting "permanent easements". If the Indians had parted with a "permanent easement" to mine silver it is hard to see how they still had it to be taken away again on the taking or extinguishment date. The most plausible theory would be that as to minerals, by the Treaty, the Indians granted no more than a license. Otherwise, it would seem the mineral value should have been excluded from the taking award, and instead the 20% royalty for breach of fair and honorable dealing in the Treaty should have applied to all the minerals, whenever removed, until exhaustion. The Commission, of course, in both cases denies that the Treaties extinguished the Indians' interest in the minerals. The mineral locators thus were not, vis-a-vis the Indians, owners of minerals still in the ground, but only of what they had extracted. Such a license theory would explain what the Commission has done and it is consistent with the usual *contra proferentem* rule applied to treaties drafted by Government officials for unlettered Indians to sign. There was no reason for an Indian to think he was granting ownership of minerals still in the ground and likely not even discovered.

As long as the Indians observed the Treaty, did not interfere with the mining operations, and accepted the annual $1,000 refresher as adequate consideration, the miners were not acting adversely to them. Having voluntarily parted with the licenses they did part with, the Indians had no cause of action accruing to them as for a taking until more had happened, *i. e.*, the general taking of January 1, 1875. They were therefore entitled to no more than the Commission has given them, an upward adjustment of the $1,000 per annum to a fair and honorable royalty, for minerals extracted before January 1, 1875.

■ By this analysis, neither the Treaty, nor the miner's locations, nor the establishment of mining districts, nor the enactment of mining legislation by Congress, can be regarded as anticipating the general taking or extinguishment, and the found date of January 1, 1875, must stand on appellate review for failure of appellant to demonstrate that it is wrong. As in some other cases, an earlier date would no doubt also have been sustainable if found by the Commission. Gila River Pima-Maricopa Indian Community v. United States, 494 F.2d 1386, 204 Ct.Cl. 137 (1974), cert. denied, 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974); United States v. Fort Sill Apache Tribe, 480 F.2d 819, 202 Ct.Cl. 134 (1973).

### VI

United States v. Northern Paiute Nation, 490 F.2d 954, 203 Ct.Cl. 468 (1974), is not contrary to the decision we reach today. That case involved no treaty. The Indians were expelled from the mining area by the armed forces of the United States. The miners entered adversely to them, with the retrospective backing of United States law. We held that, in the instances of tracts where earlier takings had obviously occurred, an average or composite taking date, used for valuation purposes, was not *res judicata* that taking had occurred only later. The Indians thus had no claim for "trespass damages" after their taking claim was settled. Here we have also an average or composite date, but there are no other taking dates to compete with it, and therefore it must stand.

Moreover, in *Northern Paiute* the record afforded disturbing indications that the Indians were being paid twice for the same thing. In the earlier award, affirmed 393 F.2d 786, 183 Ct.Cl.

321 (1968), the Commission had valued the tract there involved at $15,750,000 as of a January 1, 1863 taking date. It considered evidence of value calculated from the supposed mineral content of the land on that date, but based the award for the mineral portion primarily on a "sales index of value" constructed from actual purchases and sales of mining rights and mining stock, thus on the miners' speculations. It was undisputed that the speculative fever was high and that values had moved steadily upward since the expulsion of the Indians. The Government claimed credit for values added by the miners since the expulsion. These were considerable: values added by physical structures, by discovery of new ore bodies, and by speculation. We denied this credit on the ground among others, that no computation had been made or offered as to injury to value by the miners' ravages. The new proceeding, however, in the guise of trespass damages would have assessed liability for the ravages without giving any credit for the values added. There was nothing to show that the removal of ores before the average or composite taking date had reduced the taking award by one dollar. In proportion to the remaining mineral wealth, the pre-taking date removals were relatively small in quantity and wholly secondary to other considerations in the determination of value as found. Where the taker gets no credit for value it has added before the selected taking date it is surely questionable to assess it for what it has taken away.

Here, however, the pre-taking date removal of minerals has been relatively large and has had its full effect in assessing the taking date value. Both the royalty for pre-taking removals and the fair market value for the remaining ones were found on the basis of actual or estimated quantities and the cost of removal and marketing. The speculations of miners has not been used in the same way as in *Northern Paiute.* Appellant does not urge that the taking award of $5,980,122 is inflated. In the circumstances, it appears to us fair and just that some way be found to compensate the Indians for the pre-taking removals, assuming as we do that in negotiating the Treaty the United States made itself responsible for fair and honorable dealing. Otherwise the Indians are not made whole.

Moreover, the determination of the award at one time on both phases offers assurance that a double payment for the same thing will not be required. Appraisers are aware of this danger when they submit reports on both phases together, and the Commissioners when they hear testimony and make findings on both phases at once. We cannot assume the Commission would knowingly exact payment twice for the same thing, and here it would have been impossible to do so unwittingly.

We cannot demand a theoretically perfect award. These ancient wrongs must be settled for within our lifetimes. It remains true that the artificial postponement of a taking date with values enhanced by the taker's activities, and with felt concomitant necessity to compensate somehow for things that happened earlier, is a technique bound to produce difficulties. Other techniques no doubt present objections too. We must affirm unless the appellant shows us error we are required to correct under the statute, which it has not done here.

### VII

This is not a case of "trespass" damages, as the foregoing we hope makes clear, and we pretermit decision on that issue until we are confronted with a case that presents it.

Affirmed.