The UNITED STATES of America,
Appellant,

v.

The FORT SILL APACHE TRIBE OF
the STATE OF OKLAHOMA,
Appellee.

Appeal No. 19–74.

United States Court of Claims.

April 14, 1976.

Dean K. Dunsmore, with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for appellant.

I. S. Weissbrodt, Washington, D. C., attorney of record for appellee. Richmond F. Allan, Billings, Mont., Abe W. Weissbrodt, Ruth W. Duhl, Howard L. Sribnick, and Weissbrodt & Weissbrodt, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges, en banc.

NICHOLS, Judge.

This appeal is against an award for "trespass damages" and is another phase of a litigation almost as full of dramatic contest, confrontation, and strange turns of fate, as is the history of the claimant tribe or band in the period to which its claims relate, the nineteenth century. From the filing of the petition, August 1, 1951, there were pending simultaneous claims under the Indian Claims Commission Act, 25 U.S.C. Sec. 70 and ff., for the taking by conquest of a vast area to which it claimed aboriginal title, and for removal of resources from the same area before the date of title extinguishment. The Commission severed these claims. As to the former, it determined that the taking date was September 4, 1886. The Commission awarded $15,975,000 for the land as it was on that date, better or worse because of the defendant's previous activity. The land consisted of 14,802,387 acres in New Mexico and Arizona. On the valuation date the land benefited from good rail transportation and telegraph lines. The white population was 26,000 and value was enhanced by several townsites. The railroads had brought the tract into prominence as a livestock producing area, and it was producing minerals.

The defendant had at first acquiesced in the severance, and in the 1886 taking date, but at some point came to realize that the severance, together with the late taking date, brought forward the possibility that besides a value enhanced by the white man's occupancy and use of the tract, it might also be called on to pay "trespass

damages" for mineral extraction and timber cutting, etc., before the taking date. In its appeal before us, No. 3–72, defendant sought to undo both the severance of the two types of claims and the taking date of September 4, 1886. We held that the former, the severance, was within the Commission's discretion, and the choice of date, though patently erroneous, could not be departed from because of defendant's conduct in the litigation down to a then recent date. If we were to rule on the merits, we said, we would hold the taking date or title extinguishment would not be not later than the Act of August 15, 1876, 19 Stat. 176, 195, which directed that the Indians be confined to and not allowed to leave their proper reservations, which were remote from the tract in issue. *United States v. Fort Sill Apache Tribe,* 480 F.2d 819, 202 Ct.Cl. 134 (1973).

The severance issue came before us again in two separate and unsuccessful appeals, 481 F.2d 1294, 202 Ct.Cl. 525 (1973), and 507 F.2d 861, 205 Ct.Cl. 805 (1974), as the Government continued to try to thrash itself out of the trap it had helped to dig for itself and into which it had fallen.

As the Commission, in the decision here appealed from, has now found, before 1876 no appreciable removal of minerals had occurred. It commenced with the discovery of the Tombstone silver mining district in 1877. With use of 1876 for valuation purposes, it would have been possible to determine a single uncomplicated award for the Indians with no possible unfairness to either side.

The Commission has now awarded $10,-830,860.40 damages under Sec. 2, Cl. 5 of the above Act, in addition to the almost 16 million previously awarded, this time for minerals extracted by miners after 1876 but before the taking date as found: the so-called "trespass damages." The figure represents a 20% royalty on the estimated gross value of ore produced on the land before September 4, 1886. The Government appeals and we reverse.

Facts found in the previous case are repeated in this: The population of the tract by non-Indians by 1886 was 26,000. There were numerous settlements. The main line of the Southern Pacific crossed it and there were several branch lines of the Atcheson, Topeka and Santa Fe within it. The railroads brought the tract into prominence for livestock production. The United States encouraged development by laws, *e. g.,* Act of March 3, 1871, 16 Stat. 573, and May 10, 1872, 17 Stat. 91. It also conducted military campaigns against the Chiricahua Apaches, and tried to confine them to statutory reservations distant from the tract here involved. The Commission says it assumed responsibility for the intrusions and exploitation, dealing unfairly and dishonorably in violation of Sec. 2, Cl. 5.

In its appeal the appellant, United States, urges error in that appellees, the Indians, have estopped themselves to urge that they did not have exclusive use and occupancy up to the found taking date of September 4, 1886, and it phrases its argument in several different ways, making, however, essentially the same point. In plain terms, it is saying the Indians got the benefit of an illegitimately delayed taking date and ought to accept the burdens too. We think that the real issue is whether the Indians have a moral claim under Clauses 4 and 5 that remains unsatisfied by the award already made for the taking found to have occurred on September 4, 1886, and if so, whether the Commission has gone about satisfying it in the correct manner.

The Commission has found, 19 Ind.Cl. Comm. 212, 238, affirmed by this court, *Fort Sill Apache Tribe v. United States,* 477 F.2d 1360, 201 Ct.Cl. 630 (1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974), that the treaty of July 1, 1852, 10 Stat. 979, was dead, having been violated by both sides, and no one was in a position to assert rights thereunder. In the case above cited, we concluded that there existed no special relationship with the Tribe, from which a duty to protect might be inferred. As a matter of fact, the records in the various Chiricahua Apache cases are replete with evidence that that Tribe and the United States were at war

throughout the period when the alleged "trespass damages" were inflicted, though the above treaty had been intended as one to establish peace. In *Scott v. United States,* 33 Ct.Cl. 486 (1898), this court held that the relationship then obtaining was war. While the Commission selected the September 4, 1886, date as it was the end of organized Apache resistance, the surrender by Geronimo and his band, deep in Mexico, the claimant Tribe, all sexes and ages alike, were held as prisoners of war for some time thereafter. 1 Ind.Cl.Comm. 137, 139 (1949).

■ A duty to protect Indians against depredations by third persons may arise by treaty or statute, the breach of which duty displays a want of fair and honorable dealings under Clause 5. *Lipan Apache Tribe v. United States,* 180 Ct.Cl. 487 (1967); *United States v. Sioux Nation,* 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *United States v. Goshute Tribe,* 512 F.2d 1398, 206 Ct.Cl. 401 (1975); *Aleut Community v. United States,* 480 F.2d 831, 202 Ct.Cl. 182 (1973). Such a duty can hardly be said to arise with respect to a hostile or enemy Tribe, one with which no treaty exists. There is then not the "special relationship" or "special duty to protect" that we have considered may, if unfulfilled, display a want of fair and honorable dealings. *Lipan Apache Tribe v. United States, supra.* We think it follows that the United States is not liable for the pre-September 4, 1886 depredations of the miners because it had any duty, as it did in *United States v. Sioux Nation, supra,* to keep them out. It is liable only if the miners' acts can be imputed to the United States and are deemed in contemplation of law to be the acts of the United States.

■ We indicated in *United States v. Northern Paiute Nation,* 393 F.2d 786, 183 Ct.Cl. 321 (1968), and on the "trespass damages" phase, 490 F.2d 954, 203 Ct.Cl. 468 (1974), that we considered that the ravages of miners could be imputed to the United States and would make the United States a taker when (a) the United States military forces excluded the Indians from the mining areas and protected the miners in their possession, and (b) the United States mining laws recognized or retroactively validated titles obtained by staking claims, even though on lands whose aboriginal Indian titles had not been previously extinguished. This theory would, it would seem, require the thing taken to be at least as extensive as the staked claim. This is not the Commission's theory. By that, minerals within the claim but still in the ground remained the property of the Indians until September 4, 1886, and the United States is mulcted now only for what the miners actually removed, before that date. The Commission has further scotched the imputed taking idea by saying that its September 4, 1886 taking date here is not an average or composite date. Everything was taken then, contrary to *Northern Paiute,* where we concluded that the taking date was an average or composite, not necessarily the actual taking date for every part of the tract. The difficulty therefore shapes up to be that in the earlier *Apache* decision, as construed by the Commission in this case, the Commission of necessity found that acts constituting the United States a taker did not occur before September 4, 1886, while to sustain the imputed taking theory here, it would be necessary now to find that such acts did occur. The Commission in the earlier decision in effect found that United States troops did not drive the Apaches off the tract involved, and keep them off, on or before 1876, that miners did not thereafter enter and stake claims under authority of United States mining laws, and that Congress did not establish a reservation for the Apaches at a distant place, which they were not to be allowed to leave. We know that in history, these things occurred, but for purposes of the prior decision, they did not. The Commission will be seen, if one reads its findings herein with care, to have framed them in such a way as not to find expressly now a taking imputable to the United States. It simply says (finding 5):

Before the Chiricahua Apaches aboriginal lands were taken by the United States on September 4, 1886, the policy of the United States was to encourage the

*intrusion* upon and exploitation of the said lands by non-Indian third parties. The United States encouraged the exploitation of these lands by enacting laws aimed at developing the said lands * * * (Emphasis supplied).

It refers also to the military campaigns and the attempt, it calls unsuccessful to confine Chiricahua Apaches to reservations. But the word "taking" is carefully avoided, as it has to be to avoid overt contradiction of the former decision. It seems to be holding the United States liable for aiding and abetting tortious acts.

We thus see The Commission to have fallen between two stools. It cannot base its holding on a dishonorable failure to observe a non-existent undertaking to protect. It will not, and now cannot abandon its previous theory that the only taking imputable to the United States occurred on September 4, 1886. So it attempts to hold the United States liable for sanction and encouragement to the miners, not amounting to a taking, that makes so-called "trespass damages" imputable to the United States.

█ The record plainly shows that the United States or persons whose acts were imputable to the United States, entered the land long before the chosen taking date of 1886, and dealt with it as their own. The award for the taking on the chosen date, plainly of record was enhanced because of their value-enhancing activities such as railroad building, town building, and cattle raising. It also shows that large quantities of minerals were extracted. In fixing the 1886 value, the award was diminished because of the estimated quantity of minerals previously removed. In these circumstances, the most that fair and honorable dealings could be held to require now would be that the supplemental award here under consideration should add to the total compensation any net reduction in the compensable 1886 value caused by activities of the United States, or imputable to the United States, after expulsion of the Apaches and up to the taking date. The "trespass damages" award here under consideration blatantly fails to do this. It singles out a single activity, the mining, that the Commission considered deleterious, and makes an award for that, without any offset, leaving the Apaches to enjoy the full benefit in their primary award, without deduction, for activities that enhanced the value.

The reasons for imputing the miner's activities to the United States, whether good or bad, at any rate apply equally to the beneficent activities that enhanced the 1886 value. They too would not have been possible had not the military driven the Apaches away. They too were encouraged by the laws and policy of the Government. A mere tortious trespasser might perhaps be liable for his ravages and yet forfeit his improvements. The United States, with its sovereign rights and rights as proprietor of the soil, was not a mere trespasser. The Commission itself indeed implicitly recognizes this when it considers and rejects the Indians' claims for "trespass" to the non-mineral parts of the tract, on the ground they did not impair the total value.

In *United States v. Northern Paiute Nation, supra,* we said at 490 F.2d 958, 203 Ct.Cl. at 475:

* * * The parties were given somewhat of a washout in that in Docket 87 defendant got no credit for improvements its imputed agents, the miners, constructed, and was not asked to account for their ravages. The Commission, in Docket 87–A, would now go back on this where the ravages are concerned, without giving defendant the benefit of its improvements.

We continue to believe that fair and honorable dealings do not require adjustments to value on the taking date, of this inequitable and one-sided character.

That the removal of so many tons of ore occurred, tells us only one of many things we need to know, to make a fair and honorable adjustment for any change in value occurring between 1876 and 1886, and imputable to the United States. The record does not tell us the rest. We shudder to contemplate any further fact finding at this late date. We only say that the Commission's method of assessing pre-1886 "trespass damages" cannot be sustained.

■ The parties to Indian Claims litigation, we are told, have been awaiting a sweeping pronouncement by us as to "trespass damages." We regret this is not the case for it. It goes on its history and peculiar facts, as other cases have done. It would be unwarranted dictum to pronounce on cases not before us. We suspect, however, that other "trespass damage" cases will also go on their peculiar facts and that we will never have one suited to establish a grand and general precedent. We think the problem, at least as presented in the cases that have come before us, arises because dates for taking are selected that are unreasonably late. No doubt in many cases, as here, a proper taking date would eliminate the problem and permit a unitary taking award that would be fair and just. When the taking date is and for any reason has to be long after the United States or persons for whose acts the United States is responsible have been in possession and have made improvements, we think the damages should reflect no more than any net reduction the total of their activities have effected in the compensable value. Even with the fairest intentions, any other technique lends itself to juggling and to making the sum of the parts exceed the unitary whole.

The dissent urges that the law of the case and collateral estoppel prevent us from considering directly or indirectly, that September 4, 1886 was too late a date or that the Government could not be held liable for enhancement in value due to its acts before September 4, 1886, contrary to the decision in Appeal No. 3–72. Anticipating this argument, we took the majority opinion in that case exactly at its word. It did not undertake to commit the court to the correctness in all respects of the decision below, and instead intimated strongly it was in error. It simply held the error was not reversible for reasons given.

If, however, (as no one urges) *United States v. Santa Fe Pacific R. R.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), or any other authority, were deemed to require use of September 4, 1886, we would still be of the opinion that the assessment of "trespass damages", as done by The Commission in this case, was erroneous. We would still think that any damages for activities of the taker, or persons whose deeds are imputed to the taker, before the taking date, awarded to supplement the principal award for taking date value, and as an addition thereto, should reflect only the net unfavorable impact if any, upon value, of all activities imputable to the taker. It should not mulct the United States for the sour and ignore the sweet. The scope and variety of the taker's pre-taking acts here are what make the point so important and The Commission's error so highly prejudicial. *United States v. Goshute Tribe, supra,* is not inconsistent because it went off on the unfair and dishonorable nature of the treaty, which licensed the miners to remove minerals before the taking date. In part VI of that opinion we compared the case with *United States v. Northern Paiute Nation, supra,* and pointed out the differences that justified a different result. We indicated skepticism as to the theoretical perfection of the method used, but under the circumstances, including the role of the defendant in the litigation, we did not see prejudicial error such as would justify reversal. We think we sufficiently saved our rights to do what we think is needful here, and do not read the dissent as arguing otherwise.

In *Gila River Pima-Maricopa Indian Community v. United States,* 494 F.2d 1386, 204 Ct.Cl. 137, *cert. denied,* 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974), it is held that in some circumstances the selection of a taking date is a discretionary function. If an earlier date within the permissible zone of discretion would permit a unitary award, while a later one would involve activities of the taker on the land before the chosen date, with complications such as we have here, it would appear the earlier date would be easy to justify and the later one difficult, perhaps to the point of being abuse of discretion.

Reversed and remanded for further proceedings not inconsistent with this opinion.

*Reversed and Remanded.*

DAVIS, Judge (dissenting).

This decision means that the United States, having lost the crucial battle, nevertheless wins the war. As the court points out, the Government was well aware for a very long time that these Indians were claiming both the value of the land as of the extinguishment of Indian title (which they said occurred in 1886) and also "trespass damages" for minerals removed before that date. Despite this clear knowledge, "in the proceedings below [before the Indian Claims Commission] at no time did defendant-appellant [the Government] properly propose its alternative theories of the date of taking when the issue was pending before the Commission and seek to convince the Commission that the weight of the evidence in the record supported one or another of such theories. Likewise, at no time did defendant-appellant actively and properly oppose the taking date proposed by petitioners and found by the Commission." *United States v. Fort Sill Apache Tribe*, 480 F.2d 819, 824, 202 Ct.Cl. 134, 143–44 (1973). "As it was, the entire valuation trial centered on the 1886 date which the Government first disputed after the completion of that trial." 480 F.2d at 825, 202 Ct.Cl. at 145.[1]

I had thought that the gist of our 1973 decision was that, in those circumstances, the Government could not go behind the 1886 date which had to be accepted for all purposes as the proper date for the extinguishment of Indian title. We did observe that the record could be said to establish that Indian title was in fact cut off in 1876, but we brushed that conclusion aside because the Government's conduct of the litigation amounted to a waiver of the right to challenge the 1886 taking date. 480 F.2d at 823, 202 Ct.Cl. at 141–42.

It follows, I think, that we are prevented by the law of the case and the doctrine of collateral estoppel from considering, directly or indirectly, that 1886 was too late a

date or that value as of that time embodies enhancements for which the Government should not be held liable to these Indians. We have to act on the present appeal as if on the record of these cases 1886 was the truly correct date for the extinction of aboriginal title. On that basis I would affirm the Commission in granting "trespass damages."

Since the court does not deal at length with the pristine case of "trespass damages"—which is how I believe we must look at the instant appeal—I merely sketch my position that they are awardable. The Government centers its disagreement on the proposition that any proof of extraction of minerals, under the auspices of the United States, prior to the "taking" date would necessarily demonstrate the extinction of Indian title before that time and accordingly would conflict pro tanto with the "taking" date. The flaw I find in that argument is that it neglects the controlling standard that aboriginal title is not cut off until Congress (or the executive as its authorized delegate) decides, expressly or implicitly, that Indian title should be ended. Intrusions onto Indian land, even authorized intrusions, do not have that effect unless Congress also intended them to end, or treated them as ending, the aboriginal ownership. That intention is the ultimate touchstone, not the physical or historical facts of governmental intrusions or incursions unconnected with a purpose, implied or specific, to close out Indian title at that particular time. *See United States v. Santa Fe Pac. R. R.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Tlingit & Haida Indians v. United States*, 177 F.Supp. 452, 147 Ct.Cl. 315 (1959), *decision on valuation after remand*, 389 F.2d 778, 182 Ct.Cl. 130 (1968); *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C.1973). It would be quite possible, for instance, for Congress first to allow entries under the mining laws and then, some years later, to enact a statute terminating as of that time the Indians' aboriginal ownership

---

1. The court pointed out that the Indians might well have introduced other or additional evidence if they had been alerted that the Government was challenging the 1886 date. Likewise,

the Commission might have decided differently if it had been made aware that the 1886 date was in contest, 480 F.2d at 825, 202 Ct.Cl. at 145.

of the same lands. In such a situation the value of the minerals removed before the final "taking" date would be recoverable by the Indians as "trespass damages." *Cf. United States v. Goshute Tribe*, 512 F.2d 1398, 206 Ct.Cl. 401 (1975).

In that type of case—where mineral or other natural property is removed from aboriginal land (prior to Indian-title extinction) by, or under the direct auspices of, the United States—the claiming Indians need not prove any "special relationship" with the United States to recover under the fair-and-honorable dealings clause. The injurious act is that of the United States itself, and it is less than fair and honorable for the Government to remove minerals (without proper compensation) from land which is still possessed by the Indians (whether by recognized or by aboriginal title).

In this case, we are required, as I have suggested, by our 1973 decision to treat 1886 as if Congress had at that time passed a joint resolution ending the Indians' title although there had already been substantial intrusions for a decade before that time. The value of the minerals removed as a result of those intrusions constitute the "trespass damages" awarded by the Commission.[2] That tribunal had substantial evidence to support its figure and the royalty method it used is acceptable. There is no reason to believe that the value of the minerals was counted twice. *See United States v. Goshute Tribe, supra*, 512 F.2d at 1400, 1403, 206 Ct.Cl. at 406–07, 412.

COWEN, Chief Judge, concurring in part in the dissent of Judge DAVIS:

I concur in that portion of Judge DAVIS' dissent in which he would hold that, as a result of our 1973 decision in this case, we are prevented by the law of the case and the doctrine of collateral estoppel from considering, directly or indirectly, that the In-

dian land as of 1886 embodies enhancements for which the Government shall not be held liable to the Indians. I agree that the court must decide the present appeal on the basis that 1886 was the correct date for the extinction of aboriginal title.

---

2. In the *Goshute Tribe, supra*, 512 F.2d at 1402, 206 Ct.Cl. at 409–10, the court recognized both a general "taking" date (1875) and also the value of the minerals previously extracted. There was in that case a treaty permitting exploration of the Indian lands for minerals. Because I believe the existence of such a treaty to be unnecessary, I would apply the same rule as in *Goshute* to situations where there is no treaty but where there is extraction of minerals by the United States or under the Government's sponsorship, prior to a general "taking" of the aboriginal land.